# Exhibit 1

## to

# Notice of Removal

EFiled: Sep 07 2018 07:48PM EDT
Transaction ID 62428537
Case No. N18C-09-055 PRW

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

CALAMOS ASSET MANAGEMENT,       )
INC.                            )
                                )
            Plaintiff,          )
                                )
      v.                        )
                                )   C.A. No. _____ (CCLD)
TRAVELERS CASUALTY AND          )
SURETY COMPANY OF AMERICA,      )
                                )   **TRIAL BY JURY OF TWELVE**
            Defendant.          )   **DEMANDED**
                                )
                                )
                                )

## COMPLAINT

Plaintiff Calamos Asset Management, Inc. ("CAM"), by and through its undersigned attorneys, hereby files this Complaint against Defendant Travelers Casualty and Surety Company of America ("Travelers") and in support thereof, avers as follows:

## NATURE OF THE CASE

1.      CAM purchased a Directors & Officers ("D&O") insurance policy from Travelers for the policy period October 27, 2016 to October 27, 2017 (the "Travelers Policy" as more fully defined in Paragraph 10 below).

2.      The Travelers Policy provides coverage to CAM and, *inter alia*, its subsidiaries, certain related entities, and their directors and officers (collectively, the

"Insureds"), for claims made against the Insureds during the policy period of the Travelers Policy.

3.     CAM brings this action seeking:  (1) a declaration that Travelers is obligated to provide coverage for CAM's loss in connection with consolidated shareholder proceedings brought against certain Insureds in the Court of Chancery of the State of Delaware (the "Underlying Proceedings"); and (2) damages for breach of contract for Travelers' refusal to pay certain losses as required by the Travelers Policy, along with pre-judgment and post-judgment interest, attorneys' fees, and costs, and such other further relief as the Court may deem just and proper.

## THE PARTIES

4.     CAM is a Delaware corporation with its principal place of business at 2020 Calamos Court, Naperville, Illinois.

5.     Defendant Travelers is an insurance company incorporated in the State of Connecticut with its principal place of business at One Tower Square, Hartford, Connecticut.  Travelers is licensed to do business in the State of Delaware, has written insurance policies covering risks for Delaware citizens, and is otherwise transacting business in the State of Delaware.

## JURISDICTION AND VENUE

6.     The Court has subject matter jurisdiction pursuant to Art. IV, § 7 of the Delaware Constitution and 10 *Del. C.* § 541.  This Court has the power to declare

2

the parties' rights and obligations under 10 *Del. C.* § 6501 *et seq.* This case is properly designated for the Complex Commercial Litigation Division (CCLD) because the amount in controversy exceeds $1 million.

7.     The Court has jurisdiction over Defendant Travelers because it is licensed to do business in the State of Delaware. Moreover, Travelers issued one or more insurance policies to CAM, a Delaware corporation, and thereby insured the covered risks of Delaware citizens.

## THE SUBJECT POLICIES

8.     CAM purchased from its primary D&O liability insurer, XL Specialty Insurance Company ("XL"), a Management Liability and Company Reimbursement Insurance Policy, No. ELU146965-16, for the policy period October 27, 2016 to October 27, 2017 (the "XL Primary Policy"). A true and correct copy of the XL Primary Policy is attached hereto as Exhibit A.

9.     CAM purchased from its first-layer excess D&O insurer, Continental Casualty Company ("CNA"), a first-layer excess D&O liability policy, No. 268154065, for the policy period October 27, 2016 to October 27, 2017 (the "CNA Excess Policy"). A true and correct copy of the CNA Excess Policy is attached hereto as Exhibit B.

10.    Travelers sold a second-layer excess D&O liability policy, No. 106619456, to CAM for the policy period October 27, 2016 to October 27, 2017 (the

3

"Travelers Policy"). A true and correct copy of the Travelers Policy is attached hereto as Exhibit C.

11. Collectively, the XL Primary Policy, the CNA Excess Policy and the Travelers Policy are referred to as the "Subject Policies."

12. Collectively, the CNA Excess Policy and the Travelers Policy are referred to as the "Excess Policies."

13. CAM paid all required insurance premiums for the Subject Policies.

14. CAM has satisfied all terms and conditions of the Subject Policies.

15. The Subject Policies were in full force and effect at all pertinent times.

## FACTUAL BACKGROUND

### THE XL PRIMARY POLICY

16. The XL Primary Policy states, "[t]he Insurer shall pay on behalf of the Company Loss which the Company is required or permitted to pay as indemnification to any of the Insured Persons resulting from a Claim first made against the Insured Persons during the Policy Period or, if applicable, the Optional Extension Period, for a Wrongful Act or Employment Practices Wrongful Act." Exhibit A, Section I(B).

17. The XL Primary Policy further states, "[t]he Insurer shall pay on behalf of the Company Loss resulting solely from any Securities Claim first made against

4

the Company during the Policy Period or, if applicable, the Optional Extension Period, for a Company Wrongful Act." *Id.*, Section I(C).

18.   The XL Primary Policy defines "Insured" to include "the Insured Persons and the Company," *id.*, Section II(I), and the "Company" to include CAM and, as relevant here, its subsidiaries. *Id.*, Section II(E).

19.   The XL Primary Policy defines "Insured Person" to include "any past, present or future director, officer, partner, or member of the Board of Managers, of the Company . . . ." *Id.*, Section II(J)(1).

20.   John P. Calamos, Sr. and John Koudounis (collectively, the "Individual Underlying Defendants"), each named as a defendant in the Underlying Proceedings, were directors and officers of CAM during all or part of the period of time that the events giving rise to the Underlying Proceedings occurred, and during the pendency of the Underlying Proceedings.

21.   Accordingly, each of the Individual Underlying Defendants qualify as "Insured Persons" under the XL Primary Policy.

22.   Certain Underlying Proceedings named as a defendant Calamos Partners LLC.  The XL Primary Policy defines "Company" to include Calamos Partners LLC.  *Id.*, Endorsement No. 8.  Accordingly, Calamos Partners LLC qualifies as an "Insured" under the XL Primary Policy.

23.     Certain Underlying Proceedings named as a defendant CPCM Acquisition, Inc., which is a subsidiary of CAM. The XL Primary Policy defines "Company" to include subsidiaries of CAM, subject to additional terms not relevant here.  *Id.*, Section II(E).  Accordingly, CPCM Acquisition, Inc. qualifies as an "Insured" under the XL Primary Policy.

24.     The XL Primary Policy defines "Claim" to mean, in relevant part, "(1) a written demand for monetary or non-monetary relief; (2) any civil proceeding in a court of law or equity, or arbitration."  *Id.*, Section II(C), as amended by Endorsement No. 43.

25.     The XL Primary Policy defines "Wrongful Act" to mean, in relevant part, "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any Insured Person" while such Insured Person is acting in his or her official capacity.  *Id.*, Section II(S).

26.     The  XL Primary Policy defines "Company Wrongful Act" to mean "any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Company in connection with a Securities Claim."  *Id.*, Section II(E).

27.     The XL Primary Policy defines "Securities Claim" to mean, in relevant part: "a Claim . . . made against any Insured for: (1) any actual or alleged violation of any federal, state, local regulation, statute or rule (whether statutory or common

6

law) regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities which is: (a) brought by any person or entity based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the purchase or sale of, or offer to purchase or sell, securities of the Company . . . ." *Id.*, Section II(Q), as amended by Endorsement No. 19.

28.     The Underlying Proceedings were initiated by stockholders of CAM and involved the purchase or sale of, or offer to purchase or sell, securities of CAM.

29.     Accordingly, the Underlying Proceedings satisfy the XL Primary Policy's definition of "Securities Claim."

30.     The XL Primary Policy defines "Loss" to mean, in relevant part, "damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiple damages, where insurable by law) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay." *Id.*, Section II(M), as amended by Endorsement No. 14.

31.     The XL Primary Policy states with respect to settlement of Claims that "[n]o Insured may incur any Defense Expenses or admit liability for, make any settlement offer with respect to, or settle any Claim without the Insurer's consent, such consent not to be unreasonably withheld." *Id.*, Section V(B), as amended by Endorsement No. 21.

32.     The XL Policy provides a $10 million aggregate Limit of Liability,
excess of a self-insured Retention ("Retention") of $1 million each Claim for Claims
involving "the acquisition, assumption, merger, consolidation or otherwise of the
Company." *Id.*, Declarations, as amended by Endorsement No. 42.

## THE EXCESS POLICIES

33.     The CNA Excess Policy provides a $10 million aggregate Limit of
Liability excess of the $10 million Limit of Liability of the XL Primary Policy.
Exhibit B, Declarations.

34.     With exceptions not relevant here, the CNA Excess Policy "provide[s]
coverage in accordance with all of the terms, conditions and limitations" of the XL
Primary Policy. *Id.*, Section I.

35.     The Travelers Policy provides an additional $10 million aggregate
Limit of Liability excess of the $20 million Limits of Liability of the XL Primary
Policy and the CNA Excess Policy.  Exhibit C, Declarations.

36.     With exceptions not relevant here, the Travelers Policy "incorporates
by reference, and affords coverage in accordance with and subject to, the inuring
clauses, warranties, definitions, terms, conditions, exclusions and other provisions
contained in the" XL Primary Policy.  Exhibit C, Endorsement No. XP-10391 (the
"Insuring Agreement").

## THE UNDERLYING PROCEEDINGS

37.     On or about December 19, 2016, CAM announced that it had reached an agreement in principle to be taken private through a transaction by which an affiliated entity would commence a tender offer to acquire all of the outstanding shares of CAM's Class A common stock for $8.25 per share (the "Merger").

38.     After announcement of the Merger, and beginning on or about January 25, 2017, certain shareholders of CAM brought lawsuits in the Court of Chancery of the State of Delaware against CAM, certain if its affiliates and certain of their directors and officers, alleging breaches of fiduciary duty in connection with the Merger.   Such shareholder suits included the following: *Brian Lerman v. John Calamos, Sr. et al.*, No. 2017-0058-JTL (Del. Ch.); *Colleen Witmer v. John P. Calamos, Sr. et al.,* No. 2017-0073-JTL (Del. Ch.); *Ridgely Foster v. John P. Calamos, Sr. et al.,* No. 2017-0075-JTL (Del Ch.); *Jo-Anne Beveridge v. John P. Calamos, Sr., et al.,* 2017-0296-JTL (Del. Ch.); *Robert Schechter et al. v. John P. Calamos Sr., et al.,* No. 2017-0356-JTL (Del Ch.) (collectively, the "Shareholder Lawsuits").

39.     By Order dated July 18, 2017, Vice Chancellor Laster ordered that the Shareholder Lawsuits be consolidated into a Consolidated Stockholder Action captioned, *In re Calamos Asset Management, Inc. Stockholder Litigation*, Consolidated C.A. No. 2017-0058-JTL.

40.     In addition, after announcement of the Merger, certain shareholders of CAM brought actions against CAM in the Court of Chancery of the State of Delaware seeking, pursuant to Section 262 of the General Corporation Law of the State of Delaware, an appraisal of the fair value of their CAM shares, costs, and other relief.  Such appraisal actions were subsequently consolidated by order of the Chancery Court into a Consolidated Appraisal Action captioned, *In re Appraisal of Calamos Asset Management, Inc.*, Cons. C.A. No. 2017-0139-JTL (collectively, the "Appraisal Actions").

41.     By Order dated September 15, 2017, Vice Chancellor Laster ordered that the Consolidated Stockholder Action and the Appraisal Actions be coordinated for all purposes, including trial and pretrial discovery.  Such coordinated proceeding is referred to as the "Underlying Proceedings."

42.     Plaintiffs in the Underlying Proceedings allege that defendants in those proceedings, including the Individual Underlying Defendants, breached their fiduciary duties of care and loyalty by, *inter alia*:

        a.     devising and completing the Merger to their benefit and to the detriment of CAM's shareholders;

        b.     preventing an arm's length negotiation from taking place with respect to the Merger share price;

c.  exploiting their control over CAM to steer it into an allegedly unfair Merger and prevent any competing bids;

d.  withholding critical information about CAM's financial prospects from CAM's shareholders and from the Special Committee appointed to negotiate the share price;

e.  intentionally depressing CAM's valuation during the period leading up to the Merger, in order to acquire the company at a depressed price; and

f.  engaging in a self-dealing transaction with CAM and its shareholders without paying a fair price or dealing fairly.

43.  Trial in the Underlying Proceedings is scheduled for February 11 – 15, 2019.

## THE COVERAGE DISPUTE

44.  CAM provided timely written notice to Travelers of the Underlying Proceedings under the Travelers Policy.

45.  After CAM satisfied the $1 million Retention under its XL Primary Policy through the payment of Defense Costs incurred in the Underlying Proceedings, CAM's primary insurer XL began funding Defense Costs incurred by CAM in the Underlying Proceedings.

46.  Throughout the pendency of the Underlying Proceedings, CAM kept its D&O insurers, including Travelers, apprised of developments in those

Underlying Proceedings, and furnished its D&O insurers with extensive information and documentation relevant to the Underlying Proceedings.

47.    By letter dated August 3, 2018, Travelers denied coverage under the Travelers Policy for some or all of the allegations in the Underlying Proceedings.

48.    By letter dated September 7, 2018, Travelers supplemented its August 3, 2018 letter and reiterated its denial of coverage under the Travelers Policy for some or all of the allegations in the Underlying Proceeding.

49.    Because the Underlying Proceedings allege that the Insureds are liable for Wrongful Acts covered by the Travelers Policy, the Underlying Proceedings constitute a covered "Claim" within the definition of the Travelers Policy.

50.    No exclusions or other limitations in the Travelers Policy apply to bar or limit coverage for settlement of the Underlying Proceedings.

## FIRST CLAIM FOR RELIEF
(Declaratory Judgment)

51.    CAM restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

52.    CAM has fully complied with all of the terms and conditions of the Travelers Policy with regard to its Claim arising from the Underlying Proceedings.

53.    A justiciable controversy exists between CAM and Travelers as to their respective rights and obligations, and the scope of coverage owed to CAM for its Claim under the Travelers Policy.

54.     CAM seeks a judicial determination to resolve a present justiciable controversy among the parties regarding coverage of its Claim under the Travelers Policy.

55.     CAM is entitled to a judicial declaration by the Court that Travelers is obligated to pay on behalf of the Insureds all Loss arising from the Claim, subject to the limits of liability of the Travelers Policy.

56.     The issuance of declaratory relief by this Court will terminate some or all of the existing controversy among the parties.

## SECOND CLAIM FOR RELIEF
(Breach of Contract)

57.     CAM restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

58.     CAM has fully complied with all of the terms and conditions of the Travelers Policy with regard to the Claim.

59.     Travelers has unreasonably declined to acknowledge and agree to provide coverage for the Claim under the Travelers Policy.

60.     Travelers' refusal to agree to contribute its respective share of the costs of settling the Underlying Proceedings constitutes a material breach of Travelers' obligations under the Travelers Policy.

61.    Travelers' breach of the Travelers Policy has proximately caused CAM harm for which CAM is entitled to damages according to proof, but in any event exceeding $1 million, exclusive of interest, attorneys' fees, and costs.

62.    By reason of the foregoing, Travelers is liable to CAM for the amount of the Claim and for additional damages that CAM has sustained and will sustain as a result of Travelers'  breach of its contract.  Such damages include, but are not limited to: amounts CAM has incurred in establishing the extent of its losses; consequential damages; pre- and post-judgment interest; and attorneys' fees, costs, and disbursements that CAM has incurred to date and may incur in the future in prosecuting this action to obtain the benefit of its insurance coverage.

## PRAYER FOR RELIEF

**WHEREFORE,** CAM respectfully requests an order as follows:

a.    Awarding CAM compensatory and consequential damages in an amount to be awarded at trial but in any event exceeding $1 million;

b.    Declaring that Travelers is obligated to pay on behalf of and/or indemnify CAM for settlement costs incurred in connection with the Claim;

c.    Awarding CAM its attorneys' fees and costs of suit;

d.    Awarding CAM pre-judgment and post-judgment interest; and

e.    Awarding CAM any other and further relief as this Court deems just and proper.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Matthew J. Schlesinger
Ralph M. Muoio
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC  20001
Telephone:  (202) 662-5581
mschlesinger@cov.com
rmuoio@cov.com

Dated:  September 7, 2018

By: */s/ Jennifer C. Wasson*
        Jennifer C. Wasson (No. 4933)
        Carla M. Jones (No. 6046)
        Hercules Plaza, Sixth Floor
        1313 North Market Street
        Wilmington, Delaware 19801
        Telephone: (302) 984-6000
        jwasson@potteranderson.com
        cjones@potteranderson.com

        *Attorneys for Plaintiff*

15



EFiled: Sep 07 2018 07:48PM EDT
Transaction ID 62428537
Case No. N18C-09-055 PRW

# EXHIBIT A



**XL Catlin - Professional Insurance**
100 Constitution Plaza
17th  Floor
Hartford, CT 06103
Phone 860-246-1863
Fax    860-246-1899

November 14, 2016

Michael Becker
Aon
200 East Randolph Street
12th Floor
Chicago, IL 60601

**Re: Calamos Asset Management, Inc.**
    **Management Liability and Company Reimbursement Policy**

Dear Michael,

Enclosed, please find the policy for **Calamos Asset Management, Inc.**  Thank you for choosing XL Insurance.
Please call if you have any questions or concerns.

Sincerely,

Hank Toolan

mw

**Policy Number:** **ELU146965-16**
**Renewal of Number:** ELU141498-15

☐ **Greenwich Insurance Company**
☒ **XL Specialty Insurance Company**
**Members of the XL America Companies**

---

**MANAGEMENT LIABILITY AND
COMPANY REIMBURSEMENT
INSURANCE POLICY DECLARATIONS**

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

---

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO
CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD.
THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE
EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY
THE INSURER TO DEFEND ANY INSURED. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

---

**Item 1.** **Name and Mailing Address of Parent Company:**

Calamos Asset Management, Inc.
2020 Calamos Court
Naperville, IL 60563

---

**Item 2.** **Policy Period:** **From:** October 27, 2016 **To:** October 27, 2017

At 12:01 A.M. Standard Time at your Mailing Address Shown Above

---

**Item 3.** **Limit of Liability:**

$10,000,000 Aggregate each **Policy Period** (including Defense **Expenses**)

---

**Item 4.** **Retentions:**

| | |
|---|---|
| $0 | each **Insured Person** under INSURING AGREEMENT I (A) |
| $500,000 | each **Claim** under INSURING AGREEMENT I (B) |
| $500,000 | each **Claim** under INSURING AGREEMENT I (C) |

---

**Item 5.** **Optional Extension Period:**

Length of Optional Extension Period:

(Either one year or two years after the end of the **Policy Period**, at the election of the **Parent Company**)

Premium for Optional Extension Period:

| | | |
|---|---|---|
| One Year: | $414,816.50 |
| Two Years: | N/A |
| Three Years: | N/A |

---

**Item 6.** **Pending and Prior Litigation Date:** October 27, 2004

---

**Item 7.** **Notices required to be given to the Insurer must be addressed to:**

XL Professional Insurance
100 Constitution Plaza, 17th Floor
Hartford, CT 06103
Toll Free Telephone: 877-953-2636

---

DO 70 00 11 01

## MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT POLICY DECLARATIONS

| Item 8. | **Premium:** | |
|---|---|---|
| | Taxes, Surcharges or Fees: | $0.00 |
| | Total Policy Premium: | $237,038.00 |

| Item 9. | **Policy Forms and Endorsements Attached at Issuance:** |
|---|---|

DO 71 00 09 99  XL 82 01 07 07  XL 80 24 03 03  DO 72 06 02 00  DO 80 142 10 01  DO 83 133 12 06
XL 83 29 01 01  DO 80 300 12 04  DO 80 48 07 00  DO 80 17 05 00  XL 80 22 05 02  DO 83 72 05 03
DO 80 292 10 04  DO 80 354 05 06  DO 80 372 11 06  DO 80 02 02 10  DO 80 421 07 07
DO 80 412 05 07  DO 80 562 06 10  DO 80 415 06 07  DO 83 163 08 08  DO 80 08 03 00
DO 80 253 01 04  DO 80 284 08 04  DO 80 403 03 07  XL 80 38 02 05  XL 80 02 03 00
Manuscript 6622 11 06  Manuscript 1607 04 05  Manuscript 1611 04 05  Manuscript 15090 12 12
Manuscript 11419 11 10  Manuscript 9918 09 09  Manuscript 10915 07 10  DO 80 597 07 11
DO 83 177 11 09  DO 83 197 05 11  DO 80 218 04 03  DO 80 47 07 00  Manuscript 14935 10 12
Manuscript 12862 11 11  Manuscript 11854 03 11  DO 82 29 10 05  Manuscript 12462 04 12
Manuscript 12117 05 11  Manuscript 12469 08 11

Countersigned: _____ By: _____
                        Date                                       Authorized Representative

---

THESE DECLARATIONS AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

---

In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly authorized representative of the Insurer.

Nicholas M. Brown, Jr.
President

Theresa M. Morgan
Secretary

**Greenwich Insurance Company**

Nicholas M. Brown, Jr.
President

Theresa M. Morgan
Secretary

**XL Specialty Insurance Company**

# IN WITNESS

## XL SPECIALTY INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT: REGULATORY
EXTON, PA 19341-1120
PHONE: 800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Insurer.

Joseph Tocco
President

Toni Ann Perkins
Secretary

LAD 400 0915 XLS
© 2015 X.L. America, Inc.  All Rights Reserved.  May not be copied without permission.

# POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.   Under your existing coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by federal law.  Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019; and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. However, your policy may contain other exclusions that may affect your coverage.  The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived. Any premium waiver is only valid for the current Policy Period.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer: **XL Specialty Insurance Company**

Policy Number: **ELU146965-16**

_____
Signature of Insured

_____
Print Name and Title

_____
Date

# NOTICE TO POLICYHOLDERS

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC and possibly the U.S. Department of State.  **Please read this Policyholder Notice carefully.**

OFAC administers and enforces sanctions policy based on Presidential declarations of "national emergency".  OFAC has identified and listed numerous

- Foreign agents
- Front organizations
- Terrorists
- Terrorist organizations
- Narcotics traffickers

as *Specially Designated Nationals and Blocked Persons*.  This list can be found on the U.S. Department of the Treasury's web site - http//www.treas.gov/ofac.

The Secretary of the Treasury also has identified a number of entities in the insurance, petroleum, and petrochemicals industries determined to be owned or controlled by the Iranian government. Business transactions with any of these entities are expressly prohibited.  These entities have been added to OFAC's list of *Financial Institutions Determined To Be Owned or Controlled by the Government of Iran*.  This list can be found on the U.S. Department of the Treasury's web site – http://www.treasury.gov/resource-center/sanctions/Programs/Pages/iran.aspx, see List of CISADA and NDAA Prohibitions or Conditions

In accordance with OFAC regulations, or any applicable regulation promulgated by the U.S. Department of State, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC.  When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

PN CW 05 0914

©2014 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# NOTICE TO POLICYHOLDERS

### PRIVACY POLICY

The XL Catlin insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality. For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies. For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way. In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

## Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us. Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products. We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you. Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the XL Catlin insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

## Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services. The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you. The information we collect will vary with the type of insurance you seek;

PN CW 02 1015

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;
- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies. The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you. We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so. The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim. In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit. We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

## Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law. If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

## Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

## Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law. Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party. Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment. "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc. We also do not disclose to any unaffiliated third party a policy or account number for use in marketing. We may share with our affiliated companies information that relates to our experience and transactions with the customer.

## Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed. However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you. We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

© 2015 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

### FRAUD NOTICE

| | |
|---|---|
| **Arkansas** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable for insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **New York** | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation. |
| | **All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation. |
| | **Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime. |
| | The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
| **Ohio** | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| **Oklahoma** | **WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| **Pennsylvania** | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties. |
| | **Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| **Puerto Rico** | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |

PN CW 01 0915

Page 2 of 3

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Workers' Compensation:** It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:** Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

© 2015 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

**ILLINOIS**

This notice is to advise you if you are having problems with your insurance company or agent, do not hesitate to contact the insurance company or agent to resolve your problem.

FOR INFORMATION, OR TO MAKE A COMPLAINT, CALL:

1-800-622-7311
XL CATLIN
SEAVIEW HOUSE
70 SEAVIEW AVENUE
STAMFORD, CT  06902-6040

Part 919 of the Rules of the Illinois Department of Insurance requires that our company advise you that, you may also take your matter up with the Illinois Department of Insurance at the following addresses:

Illinois Department of Insurance
Consumer Division
122 S. Michigan Ave., 19th Floor
Chicago, Illinois 60603

Illinois Department of Insurance
Consumer Division
320 West Washington Street
Springfield, Illinois 62767

http://insurance.illinois.gov/  312-814-2420 or 217-782-4515

© 2016 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**Endorsement No.: 1**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# CHANGE OF PREAMBLE ENDORSEMENT

The preamble to this Policy is amended to read in its entirety as follows:

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Insurer identified in the Declarations (hereinafter the Insurer) including the Application and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:**

All other terms, conditions and limitations of this Policy shall remain unchanged.

XL 80 24 03 03

**Endorsement No.: 2**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 8. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 72 06 02 00**

**Endorsement No.: 3**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# ILLINOIS AMENDATORY ENDORSEMENT

1.  Section VI. GENERAL CONDITIONS (C) OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES (1) is deleted and replaced by the following:

    (1)  Except as provided in Section (C)(2) below, if the Insureds have insurance provided by other companies against a Loss covered by this Policy, the Insurer shall not be liable under this Policy for a greater proportion of such Loss than the Limit of Liability stated in the Declarations bears to the total applicable Limit of Liability for all valid and collectible insurance against such Loss.

2.  Section VI.  GENERAL CONDITIONS (E) CANCELLATION AND RENEWAL OF COVERAGE (2) is amended by the addition of the following:

    The Insurer will also mail a copy of notice of cancellation to the Parent Company's broker and any mortgagee or lienholder, if known.

3.  Section VI.  GENERAL CONDITIONS (E) CANCELLATION AND RENEWAL OF COVERAGE (3) is amended by the addition of the following:

    The notice of non-renewal will state the reason for such non-renewal.  The Insurer will also mail a copy of the notice to the Parent Company's agent of record or broker and any mortgagee or lienholder, if known.

All other terms, conditions and limitations of this Policy remain unchanged.

**DO 80 142 10 01**

**Endorsement No.: 4**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND SECTION IV ENDORSEMENT

In consideration of the premium charged, Section IV Limit of Liability, Indemnification and Retentions (F) of the Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 83 133 12 06**

**Endorsement No.: 5**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# EXCLUSION (G) ENDORSEMENT

In consideration of the premium charged, Section III Exclusion (G) of the Policy shall not apply to the extent a Claim is brought by a creditors committee of the Company in the event such Company files for relief under Title 11 of the United States Code.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**XL 83 29 01 01**

**Endorsement No.: 6**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# FAMILY EXCLUSION

In consideration of the premium charged, no coverage will be available under this Policy for any Claim, including but not limited to any shareholder derivative action or any representative class action, made by or on behalf of in the name or right of:

(1)     John P. Calamos, Nick P. Calamos and John P. Calamos Jr. or

(2)     any person related to John P. Calamos, Nick P. Calamos and John P. Calamos, Jr. through the 5th degree of consanguinity, or

(3)     any spouse of any individual in (1) or (2) above,

(4)     any assignee, heir, agent, representative, estate or other legal representative of any individual in (1), (2) or (3) above, or

(5)     any corporation, partnership or other entity in which any individual or entity described in (1), (2), (3) or (4) above has more than a 5% equity interest.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 300 12 04**

**Endorsement No.: 7**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND EXCLUSION (H) ENDORSEMENT

In consideration of the premium charged, Section III Exclusion (H) of the Policy shall not apply to the extent such Claim is brought:

    (1)    is brought derivatively by a security holder of the Non-Profit Entity or Joint Venture who, when such Claim is made and maintained is acting independently of, and without the active solicitation, assistance, participation or intervention of an Insured, Non-Profit Entity or Joint Venture;

    (2)    is brought by the Bankruptcy Trustee or Examiner of the Non-Profit Entity or Joint Venture or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Non-Profit Entity or Joint Venture.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 80 48 07 00

**Endorsement No.: 8**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF COMPANY

In consideration of the premium charged, Section II (D), Definition of "Company," is amended to include:

Calamos Asset Management, Inc.
Calamos Investments LLC
Calamos Advisors LLC
Calamos Financial Services LLC
Calamos Partners LLC
Calamos Property Management LLC
Calamos Investments LLP (UK Entity)
Calamos Investments LLC
Calamos Wealth Management LLC
Calamos International Holdings LLC
Calamos International Holdings II LLC
Calamos Investments (HK) Limited
Calamos Capital Management LLC

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 17 05 00**

**Endorsement No.: 9**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# ADD COVERAGE FOR COSTS INCURRED IN INVESTIGATING AND EVALUATING SHAREHOLDER DERIVATIVE DEMANDS

(1)   In addition to the coverage otherwise provided under this Policy, but still subject to the Insurer's maximum aggregate Limit of Liability as set forth in ITEM 3 of the Declarations, the Insurer shall pay on behalf of the Company all Investigation Costs resulting solely from any Shareholder Derivative Demand first made during the Policy Period or, if applicable, the Optional Extension Period, for a Wrongful Act committed or attempted, or allegedly committed or attempted, by any Insured Person.

(2)   "Investigation Costs" mean reasonable fees and expenses of attorneys and experts retained by the Company, or by its board of directors or any committee thereof, that are incurred by the Company in the Company's investigation or evaluation of a Shareholder Derivative Demand. Investigation Costs will not include the Company's overhead expenses or any salaries, wages, fees or benefits of its directors, officers or employees.

(3)   "Shareholder Derivative Demand" means a written demand, made by one or more of the shareholders of the Company upon the Company's board of directors, for the Company to bring a civil proceeding in a court of law against an Insured Person.

(4)   The Insurer's maximum aggregate limit of liability under this Policy for Investigation Costs shall be $500,000, which amount shall be part of, and not in addition to, the Insurer's maximum aggregate Limit of Liability under this Policy as set forth in ITEM 3 of the Declarations.   Payment by the Insurer of Investigation Costs shall reduce the Limit of Liability.

(5)   The coverage provided under paragraph (1) above will be subject to the exclusions set forth in Section III of this Policy and to any exclusions that may be set forth in other endorsements to this Policy, and any references in those exclusions to Loss and Claims shall be deemed to refer instead to Investigative Costs and Shareholder Derivative Demands, respectively.

(6)   No retention will apply to Investigation Costs payable under paragraph (1) above.

(7)   It shall be the duty of the Company to investigate and evaluate any Shareholder Derivative Demand.

(8)   For purposes of the coverage provided under paragraph (1) above, all references in Sections V.C and VI to Loss and Defense Expenses shall be deemed to refer instead to Investigative Costs, and all references in Sections V.C and VI to Claims shall be deemed to refer instead to Shareholder Derivative Demands.

All other terms, conditions and limitations of this Policy shall remain unchanged.

XL 80 22 05 02

**Endorsement No.: 10**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# DEBTOR IN POSSESSION ENDORSEMENT

In consideration of the premium charged, the term "Insured" shall include the Company as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 83 72 05 03

**Endorsement No.: 11**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# PROFESSIONAL SERVICES EXCLUSION

In consideration of the premium charged:

(1)   No coverage will be available under this Policy for Claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the performance or failure to perform professional services.

(2)   Paragraph (1) will not apply with respect to a Securities Claim brought by a security holder of the Company brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 292 10 04**

**Endorsement No.: 12**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND NOTICE OF CLAIM ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (A)(1) of the Policy is amended to read in its entirety as follows:

(1)     As a condition precedent to any right to payment under this Policy with respect to any Claim, the Insured shall give written notice to the Insurer of any Claim as soon as practicable after it is first made and the General Manager of such Company first becomes aware of such Claim, but in no event later than sixty (60) days after the expiration of the Policy Period.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 354 05 06**

**Endorsement No.: 13**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# SPECIFIED OTHER INSURANCE ENDORSEMENT

In consideration of the premium charged:

(1)   Solely with respect to any Employment Practices Claim, it is understood and agreed that the coverage provided under this Policy will be specifically excess of, and will not contribute with, The Traveler's Employment Practices Liability Policy, Policy No. 105553352, and any other policy or policies excess thereof issued to the Insured, and no coverage will be available under this Policy for Claims as to which such other insurance applies unless and until the limit or limits of liability of such other insurance shall have been completely exhausted by the payment of loss thereunder. Nothing herein shall be construed to limit, restrict or otherwise affect coverage under this Policy for Loss, including Defense Expenses, not covered under such other insurance.

(2)   Nothing in this endorsement is intended, nor shall it be construed, to make this Policy subject to any terms of any other insurance policy.

(3)   Section VI General Conditions (C) of the Policy shall be deemed to have been amended as necessary to effect the purpose and intent of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 372 11 06**

**Endorsement No.: 14**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF LOSS ENDORSEMENT

In consideration of the premium charged, Section II Definition (M) of the Policy is amended to read in its entirety as follows:

"(M)   'Loss' means damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts (including punitive, exemplary or multiple damages, where insurable by law) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay.  Loss will not include:

   (1)   fines, penalties or taxes imposed by law, or

   (2)   matters which are uninsurable under the law pursuant to which this Policy is construed.

   NOTE:   With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law.  If, based on the written opinion of counsel for the Insured, punitive damages are insurable under applicable law, the Insurer will not dispute the written opinion of counsel for the Insured."

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 02  02 10**

**Endorsement No.: 15**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF INSURED PERSON

In consideration of the premium charged, the term "Insured Person," as defined in Section II Definition (J)(1) of the Policy, shall include those individuals holding the following positions for the Company:

Partners
Employed Attorneys

All other terms, conditions and limitations of this policy shall remain unchanged.

**DO 80 421 07 07**

**Endorsement No.: 16**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF APPLICATION ENDORSEMENT

In consideration of the premium charged, the term "Application," as defined in Section II Definitions (A) of the Policy, is amended to include any public documents filed within twelve (12) months of the Inception Date of the Policy Period by a Company with any federal, state, local or foreign regulatory agency (including but not limited to the Securities and Exchange Commission).

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 412 05 07**

**Endorsement No.: 17**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# EXTRADITION ENDORSEMENT

In consideration of the premium charged:

(1)   The term "Claim," as defined in Section II Definitions (C) of the Policy, is amended to include:

    (a)   any official request for Extradition, as defined below, of any Insured Person; and

    (b)   the execution of a warrant for the arrest of an Insured Person where such execution is an element of Extradition.

(2)   The term "Defense Expenses," as defined in Section II Definitions (F) of the Policy, is amended to include reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the Insurer resulting from an Insured Person lawfully:

    (a)   opposing, challenging, resisting or defending any request for or any effort to obtain the Extradition of such Insured Person; or

    (b)   appealing any order or other grant of Extradition of such Insured Person.

(3)   Solely for the purposes of this endorsement, the term "Extradition" means any formal process by which an Insured Person located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 80 562 06 10

**Endorsement No.: 18**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# SECTION 11, 12 & 15 ENDORSEMENT

In consideration of the premium charged:

(1)     Notwithstanding Endorsement No. 14 to this Policy, Section II Definition (M)(2) of the Policy is amended to read in its entirety as follows:

     "(2)     matters which are uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any settlement in a Claim arising from an initial or subsequent public offering of the Company's securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933)."

(2)     Section III Exclusion (F)(2) of the Policy will not apply to allegations in a Claim asserted against an Insured under Section 11 and/or 12 of the Securities Act of 1933 as amended arising out of an initial or subsequent public offering of the Company's securities (including alleged violations of Section 11 and/or 12 of the Securities Act of 1933 by a Controlling Person pursuant to Section 15 of the Securities Act of 1933).

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2010 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

DO 80 415 06 07

**Endorsement No.: 19**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF SECURITIES CLAIM ENDORSEMENT

In consideration of the premium charged, Section II Definitions (Q) of the Policy is amended to read in its entirety as follows:

"(Q)      'Securities Claim' means a Claim, other than an administrative or regulatory proceeding against or investigation of a Company, made against any Insured for:

(1)      any actual or alleged violation of any federal, state, local regulation, statute or rule (whether statutory or common law) regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities which is:

(a)      brought by any person or entity based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the purchase or sale of, or offer to purchase or sell, securities of the Company; or

(b)      brought by a security holder of a Company with respect to such security holder's interest in securities of such Company; or

(2)      brought derivatively on behalf of the Company by a security holder of such Company.

Notwithstanding the foregoing, the term 'Securities Claim' shall include an administrative or regulatory proceeding against, or investigations of, a Company, but only if and only during the time that such proceeding or investigation is also commenced and continuously maintained against an Insured Person."

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 83 163 08 08**

**Endorsement No.: 20**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# SEVERABILITY ENDORSEMENT

In consideration of the premium charged, the last sentence of Section III Exclusions of the Policy is amended to read in its entirety as follows:

"No conduct of any Insured will be imputed to any other Insured to determine the application of any of the above EXCLUSIONS."

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2008 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**DO 80 08 03 00**

**Endorsement No.: 21**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND SETTLEMENT ENDORSMENT

In consideration of the premium charged, Section V (B), Settlement, is deleted in its entirety and replaced by the following:

(B)   No Insured may incur any Defense Expenses or admit liability for, make any settlement offer with respect to, or settle any Claim without the Insurer's consent, such consent not to be unreasonably withheld.

Notwithstanding the foregoing, the Insurer's consent to a settlement need not be obtained if:

(a)   the total amount of the settlement and all related Defense Expenses in the aggregate do not exceed fifty percent (50%) of the applicable retention set forth in ITEM 4 of the Declarations and no Insured shall seek payment from the Insurer with respect to all or part of such settlement or any Defense Expenses;

(b)   the Insured shall promptly provide written notice of such settlement to the Insurer; and

(c)   the Insured shall comply in all respects with its obligations under Section VI (G) of this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 253 01 04**

**Endorsement No.: 22**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND NOTICE OF NON-RENEWAL

In consideration of the premium charged, Section VI General Conditions (E)(3) of the Policy is amended to read in its entirety as follows:

    (3)    The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the Parent Company written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 284 08 04**

**Endorsement No.: 23**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND GENERAL CONDITIONS (C)(1) ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (C)(1) of the Policy is amended to read in its entirety as follows:

"(1)     All Loss payable under this Policy will be specifically excess of and will not contribute with any other valid and collectible insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy.  This Policy will not be subject to the terms of any other insurance policy."

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 403 03 07**

**Endorsement No.: 24**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND INSURER'S RIGHTS OF SUBROGATION

In consideration of the premium charged, it is understood and agreed that, in the event of payment under the Policy, the Insurer will not be subrogated to any Insured's potential or actual rights of recovery in connection therewith against any Insured Person unless it is established, by final adjudication in the underlying Claim, admission of the Insured Person or otherwise, that such Insured Person committed any intentionally dishonest, fraudulent or criminal act or omission, willfully violated any statute, rule or law, or obtained any profit or remuneration to which such Insured Person was not legally entitled, and Section VI. GENERAL CONDITIONS (G)(2) will be deemed to have been amended accordingly.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**XL 80 38 02 05**

**Endorsement No.: 25**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# INCONSISTENCY ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that in the event that there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy modified by another endorsement attached to this Policy, then where permitted by law, the Insurer shall apply those terms and conditions of the endorsement which are more favorable to the Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

XL 80 02 03 00

**Endorsement No.: 26**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# WORLDWIDE ENDORSEMENT

In consideration of the premium charged:

(1)    Notwithstanding differences in the substantive and procedural laws of any foreign jurisdiction as compared to the United States federal and state laws, the Insurer agrees to provide coverage in foreign jurisdictions worldwide and agrees that it shall interpret the coverage provided by this Policy at least as broadly, and with the same intent of coverage, as if Loss had been sustained in the United States.

(2)    In the event that a jurisdiction in which any Insured(s) is doing business requires by law or regulation that the Insurer uses approved, filed or otherwise accepted local policy forms, the Insurer shall take such steps as are necessary to ensure that the coverage provided under this Policy is effective in such jurisdiction on the same or better terms and for the same term as hereunder.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 6622 11 06

**Endorsement No.: 27**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# PRIORITY OF PAYMENTS ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that if Loss, including Defense Expenses, shall be payable under more than one Insuring Agreement, then the Insurer shall, subject at all times to the Insurer's maximum aggregate Limit of Liability set forth in Item 3 of the Declarations, pay such Loss as follows:

(1)    first, the Insurer will pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Insured Persons under Insuring Agreement (A);

(2)    second, the Insurer will pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Company under Insuring Agreement (B), and

(3)    third, the Insurer will make such other payments which the Insurer may be liable to make under Insuring Agreement (C) or otherwise.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Manuscript 1607 04 05**

**Endorsement No.: 28**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND SECTION V (C) ENDORSEMENT

In consideration of the premium charged, Section V. Defense, Settlement and Allocation of Loss (C) is deleted in its entirety and replaced with the following:

"(C)   Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis in excess of the applicable Retention, if any, before the disposition of the **Claim** for which this policy provides coverage. As a condition of the advancement of **Defense Expenses,** the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will provide for the repayment of any **Loss** including **Defense Expenses** paid to or on behalf of the **Insured** if it is finally determined that the **Loss** incurred is not covered under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 29**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND SECTION III (C) ENDORSEMENT

In consideration of the premium charged, Section III. Exclusions (C) is deleted in its entirety and replaced with the following:

"(C)     for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation solely with respect to employee benefit plans sponsored by the **Company**;

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Manuscript 15090 12 12**

Endorsement No.: 30
Named Insured: Calamos Asset Management, Inc.
Policy No.: ELU146965-16

Effective: October 27, 2016
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# LIMITED LIABILITY COMPANY ENDORSEMENT

In consideration of the premium charged:

(1)     The term "Subsidiary", as defined in Section II (R), will include any limited liability company organized under the laws of any state, during any time in which the Parent Corporation and/or the Calamos Holdings, LLC own(s), directly or indirectly, the right to elect, appoint or designate more than fifty percent (50%) of the members of such company's Board of Managers.

(2)     Section II (B), Definition of "Change In Control", is deleted in its entirety and replaced by the following:

(B)     "Change In Control" means:

(1)     the acquisition of the Parent Company by another entity, or the merger of the Parent Company into another entity such that the Parent Company is not the surviving entity, or the consolidation of the Parent Company with another entity, or the acquisition of substantially all of the assets of the Parent Company by another entity;

(2)     the acquisition at any time or over a period of time during the Policy Period of record or beneficial ownership or control by any person, entity or affiliated group of persons or entities of fifty percent (50%) or more of the outstanding securities representing the present right to vote for the election of directors or member of the Board of Managers, as the case may be, of the Parent Company; or

(3)     a cumulative change during the Policy Period of fifty percent (50%) or more of the persons occupying positions on the Board of Directors or Board of Managers, as the case may be, of the Parent Company.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2012 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Endorsement No.: 31**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF SUBSIDIARY ENDORSEMENT

In consideration of the premium charged, Section II. Definition (R) of the Policy is amended to read in its entirety as follows:

"(R)    'Subsidiary' means any entity during any time in which the Parent Company or Calamos Holdings, LLC owns, directly or through one or more Subsidiary(ies), more than fifty percent (50%) of the outstanding securities issued by such entity."

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2010 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

Manuscript 9918 09 09

**Endorsement No.: 32**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF INSURED PERSON

In consideration of the premium charged:

(1)     Solely for the purposes of this endorsement, the following terms shall have the meanings set forth below:

     (a)     "Co-Defendant Insured Person" means any natural person employee of the Company, but solely in connection with services performed for the Company; and

     (b)     "Original Insured Person" means any Insured Person, other than a Co-Defendant Insured Person.

(2)     Solely with respect to Claims other than Securities Claims, the term "Insured Person," as defined in Section II Definitions (J) of the Policy, is amended to include any Co-Defendant Insured Person, but only with respect to, to the extent that, and during such time that a Claim:

     (a)     made against a Co-Defendant Insured Person is also made and continuously maintained against an Original Insured Person; and

     (b)     is for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such Co-Defendant Insured Person committed or allegedly committed in connection with services performed for the Company; or is made against a Co-Defendant Insured Person solely because of their status as an employee of the Company.

(3)     Solely with respect to Claims other than Securities Claims, no coverage will be available under this Policy for any Claim made: (a) solely against a Co-Defendant Insured Person, or (b) against a Co-Defendant Insured Person and person or entity, other than an Original Insured Person.

(4)     Solely with respect to Claims other than Securities Claims, no coverage will be available under this Policy for any Claim made against a Co-Defendant Insured Person based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving a Co-Defendant Insured Person in connection with any services performed for any entity other than the Company, or acting in their capacity as a consultant to any entity other than the Company.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2009 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Endorsement No.: 33**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND EXCLUSIONS (F) ENDORSEMENT

In consideration of the premium charged, Section III Exclusions (F) of the Policy is amended to read in its entirety as follows:

"(F)  brought about or contributed to in fact by any:

(1)  deliberately fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

(2)  profit or remuneration gained by any Insured to which such Insured is not legally entitled;

as determined by a final, non-appealable adjudication in the underlying action;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2010 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

DO 80 597 07 11

**Endorsement No.: 34**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION (F) ENDORSEMENT

In consideration of the premium charged:

(1)     The term "Defense Expenses," as defined in Section II Definition (F) of the Policy, is amended to include:

       (a)     reasonable legal fees and costs resulting from an Insured's arrest and detainment or incarceration;

       (b)     reasonable legal fees and costs incurred to facilitate an Insured's payment of amounts required to be paid pursuant to section 304 of the Sarbanes-Oxley Act of 2002 or section 954 of Dodd-Frank Wall Street Reform and Consumer Protection Act (but not the amounts repaid by the Insured pursuant to those sections); and

       (c)     reasonable legal fees and costs incurred in the defense of Corporate Manslaughter Charges.

(2)     For the purposes of this endorsement, the term "Corporate Manslaughter Charges" means a formal criminal proceeding commenced in the United Kingdom against an Insured Person of a Company domiciled or incorporated in the United Kingdom for involuntary manslaughter (including constructive manslaughter or gross negligence manslaughter) in his or her capacity as a director or officer of such Company and directly related to the business of such Company.

(3)     The term "Claim," as defined in Section II Definitions (C) of the Policy, is amended to include Corporate Manslaughter Charges; provided however, that no coverage shall be available under this Policy for any Loss, other than Defense Expenses, incurred in connection with any Corporate Manslaughter Charges.

(4)     Section III Exclusions (A) of the Policy shall not apply to any Defense Expenses incurred in connection with any Corporate Manslaughter Charges.

© 2011 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**DO 83 177 11 09**

**Endorsement No.: 35**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND EXCLUSION (A) ENDORSEMENT

In consideration of the premium charged, Section III Exclusions (A) of the Policy is amended to read in its entirety as follows:

"(A)   for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (A) will not apply to any:

(i)   allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of an Employment Practices Claim for an Employment Practices Wrongful Act; or

(ii)   Claim made under Insuring Agreement (A) of the Policy;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2009 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**DO 83 197 05 11**

**Endorsement No.: 36**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND EXCLUSION PREAMBLE ENDORSEMENT

In consideration of the premium charged, the preamble to Section III Exclusions of the Policy is amended to read in its entirety as follows:

"The Insurer shall not be liable to make any payment for Loss in connection with that portion of any Claim made against an Insured Person, or with respect to INSURING AGREEMENT (C), the Company:"

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2011 X.L. America, Inc. All Rights Reserved. May not be copied without permission.

**Endorsement No.: 37**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF CHANGE IN CONTROL ENDORSEMENT

In consideration of the premium charged, Section II Definitions (B)(3) of the Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**DO 80 47 07 00**

**Endorsement No.: 38**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# NON-PROFIT OUTSIDE DIRECTORSHIP LIABILITY ENDORSEMENT

In consideration of the premium charged, Section II (N), Definition of "Non-Profit Entity," is deleted in its entirety and replaced by the following:

(N)     "Non-Profit Entity" means any not-for-profit corporation.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 14935 10 12

**Endorsement No.: 39**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND REPRESENTATION CLAUSE ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (I) of the Policy is amended to read in its entirety as follows:

"(I)     The Insured represents that the statements and particulars contained in the Application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, form the basis of this Policy. No knowledge or information possessed by any Insured Person will be imputed to any other Insured Person. With respect to the Company only, no knowledge or information possessed by any Insured other than the Chief Executive Officer or the Chief Financial Officer of the Company will be imputed to the Company. In the event that any of the particulars or statements in the Application are untrue and are material to the underwriting of the risk, this Policy will be void with respect to any Insured who knew of such untruth.

With respect to the coverage available under Insuring Agreement (A) of the Policy, this Policy shall not be rescinded by the Insurer."

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2012 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Endorsement No.: 40**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND EXCLUSION (E) ENDORSEMENT

In consideration of the premium charged, Section III Exclusions (E) of the Policy is amended to read in its entirety as follows:

"(E)   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act which, before the Inception date of this Policy, was the subject of any notice given and accepted under any other Management Liability policy, Directors and Officers liability policy or similar policy of which this Policy is a renewal or replacement;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2011 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Manuscript 11854 03 11**

Endorsement No.: 41
Named Insured: Calamos Asset Management, Inc.
Policy No.: ELU146965-16

Effective: October 27, 2016
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND CLAIM DEFINITION ENDORSEMENT

In consideration of the premium charged,

(1)     The term "Claim," as defined in Section II Definitions (C) of the Policy, shall include any Inquiry received by an Insured Person during the Policy Period or, if applicable, the Optional Extension Period provided that an Inquiry shall only be deemed a Claim after such Inquiry is first noticed to the Insurer pursuant to General Conditions IV (D)(1).

(2)     For that portion of any Claim that is an Inquiry, Section I Insuring Agreement is amended to read in its entirety as follows:

"The Insurer shall pay on behalf of the Insured Persons Inquiry Costs resulting from an Inquiry received by such Insured Person during the Policy Period or, if applicable, the Optional Extension Period except for Inquiry Costs which the Company is permitted or required to pay on behalf of the Insured Persons as indemnification or advancement from any other source.  In the event that Inquiry Costs are not paid by any other insurance or as indemnification or advancement, this Policy will respond on behalf of the Insured Persons as if it were primary, subject to all of its terms, conditions (including, but not limited to CONDITION (B)) and limitations and without prejudice to the Insurer's excess position."

(3)     Solely for the purposes of this endorsement, the following terms shall have the meanings set forth below:

(a)     "Inquiry" means:

(i)     a subpoena or similar document compelling witness testimony or document production by an Insured Person with respect to such Insured Person's capacity in the Company or the Company's business activities;

(ii)    a written request by an Investigating Authority for an Insured Person to appear for an interview or meeting with respect to such Insured Person's capacity in the Company or a Company's business activities; or

(iii)   a request by a Company for an Insured Person to appear for an interview or meeting in connection with an investigation by an Investigating Authority or a security holder derivative demand, with respect to such Insured Person's capacity in the Company or a Company's business activities,

provided that, Inquiry shall not mean any routine or regularly scheduled oversight, compliance, audit, examination or inspection conducted by an Investigating Authority.

(b)     "Inquiry Costs" means reasonable and necessary fees, costs and expenses incurred solely by an Insured Person in connection with the preparation for or response to an Inquiry, but shall not include salaries, wages, overhead or benefit expenses associated with Insured Persons or employees of the Company or costs of complying with any formal or informal discovery request or production request seeking documents, records or electronic information that are in the possession of the Company or any third-party.

(c)     "Investigative Authority" means any federal, state, local or foreign law enforcement or governmental investigative authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general) or the enforcement unit of any securities or commodities exchange or other self-regulatory body.

All other terms, conditions and limitations of this Policy shall remain unchanged.
Manuscript 11854 03 11                                                                                     Page 1 of 1
© 2011 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

DO 82 29 10 05

**Endorsement No.: 42**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# MERGERS & ACQUISITIONS RETENTION ENDORSEMENT

In consideration of the premium charged, solely with respect to any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the acquisition, assumption, merger, consolidation or otherwise of the Company, Item 4 of the Declarations is amended to read in its entirety as follows:

Item 4    Retentions

| | |
|---|---|
| $0.00 | each Insured Person under INSURING AGREEMENT I (A) |
| $1,000,000 | each Claim under INSURING AGREEMENT I (B) |
| $1,000,000 | each Claim under INSURING AGREEMENT I (C) |

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 43**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF CLAIM ENDORSEMENT

In consideration of the premium charged:

(1)     The term "Claim," as defined in Section II Definitions (C)(4) of the Policy, is amended to read in its entirety as follows:

"(4)     a civil, criminal, administrative regulatory proceeding or investigation of an Insured Person or the Company (but with respect to the Company only for a Company Wrongful Act) which is commenced by the filing or issuance of a notice of charges, investigative order, formal request for information or similar document, including but not limited to any "Wells" or other notice from the Securities and Exchange Commission or a similar state or foreign governmental authority that describes actual or alleged violations of securities or other laws by such Insured Person or any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body having jurisdiction over any Employment Practices Wrongful Act."

(2)     The term "Claim," as defined in Section II Definitions (C) of the Policy, is amended to include:

(5)     any demand for injunctive relief;

(6)     any written request or agreement that an Insured Person or the Company toll any applicable statute of limitations; and

(7)     with respect to an Insured Person, any investigation or inquiry by a foreign government authority after service of a subpoena or similar document upon such Insured Person.

(8)     an arbitration or mediation proceeding commenced by the receipt of a demand for arbitration or mediation or similar document

(9)     any formal interview of any Insured Person by any federal or state governmental agency.

(10)    the service of a subpoena or other similar written request compelling witness testimony or document production upon an Insured Person in connection with any matters described above against any Insured Person or a Company for a Wrongful Act

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2012 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**Endorsement No.: 44**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFENSE EXPENSES ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that the term "Defense Expenses," as defined in Section II Definitions of the Policy, will include reasonable legal fees and expenses incurred to facilitate the return of compensation, bonus or other amounts found to be required pursuant to Sarbanes Oxley Act Section 304 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of an otherwise covered Claim.

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2011 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

Manuscript 12469 08 11

**Endorsement No.: 45**
**Named Insured: Calamos Asset Management, Inc.**
**Policy No.: ELU146965-16**

**Effective: October 27, 2016**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND GENERAL CONDITIONS (G) ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (G)(1) of the Policy is amended to include the following:

The failure of any **Insured Person** to give the **Insurer** cooperation and information as required shall not impair the rights of any other Insured Person under this policy

All other terms, conditions and limitations of this Policy shall remain unchanged.

© 2011 X.L. America, Inc.  All Rights Reserved. May not be copied without permission.

**MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT INSURANCE COVERAGE FORM**

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Executive Liability Underwriters, the Underwriting Manager for the Insurer identified in the Declarations (hereinafter the Insurer) including the Application and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:**

## I.   INSURING AGREEMENTS

(A)   The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act,** except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)   The Insurer shall pay on behalf of the **Company Loss** which the **Company** is required or permitted to pay as indemnification to any of the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act.**

(C)   The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Company Wrongful Act.**

## II.   DEFINITIONS

(A)   **"Application"** means:

   (1)   the application attached to and forming part of this Policy; and

   (2)   any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B)   **"Change In Control"** means:

   (1)   the merger or acquisition of the **Parent Company,** or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity;

   (2)   the acquisition by any person, entity or affiliated group of persons or entities of the right to vote, select or appoint more than fifty percent (50%) of the directors of the **Parent Company;** or

   (3)   the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Parent Company.**

(C)   **"Claim"** means:

   (1)   a written demand for monetary or non-monetary relief;

   (2)   any civil proceeding in a court of law or equity, or arbitration;

   (3)   any criminal proceeding which is commenced by the return of an indictment; and

   (4)   a formal civil, criminal, administrative regulatory proceeding or formal investigation of an **Insured Person** or the **Company** (but with respect to the **Company** only for a **Company Wrongful Act**) which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such **Insured Person** or the **Company** as a person or entity against whom a proceeding as described in (C)(2) or (3) above may be commenced, including any

proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body having jurisdiction over any **Employment Practices Wrongful Act**.

(D)   **"Company"** means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the Policy Period, subject to GENERAL CONDITIONS VI (D).

(E)   **"Company Wrongful Act"** means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Company in connection with a **Securities Claim**.

(F)   **"Defense Expenses"** means reasonable legal fees and expenses incurred in the defense of any **Claim** including the premium for an appeal bond, attachment bond or similar bond but will not include applying for or furnishing such bond. **Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

(G)   **"Employment Practices Wrongful Act"** means any actual or alleged:

(1)   wrongful termination of employment whether actual or constructive;

(2)   employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

(3)   sexual or other harassment in the workplace; or

(4)   wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, or refusal to hire.

(H)   **"Employment Practices Claim"** means a **Claim** alleging an **Employment Practices Wrongful Act**.

(I)   **"Insured"** means the **Insured Persons** and the **Company**.

(J)   **"Insured Person"** means:

(1)   any past, present or future director or officer, or member of the Board of Managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

(2)   any past, present or future employee of the **Company** to the extent any **Claim** is a **Securities Claim**;

(3)   an individual identified in (J)(1) above who, at the specific written request of the **Company**, is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**;

(4)   any individual identified in (J)(1) above who, at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

(5)   the lawful spouse of any person set forth in the above provisions of this definition, but only to the extent the spouse is a party to any Claim solely in their capacity as a spouse of such persons and only for the purposes of any Claim seeking damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in (J)(1), (2), (3), (4) or (5) above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** or **Employment Practices Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

(K)     "**Interrelated Wrongful Acts**" means any **Wrongful Act**, **Company Wrongful Act**, or **Employment Practices Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

(L)     "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary**, during any time in which the Parent Company, either directly or through one or more **Subsidiary(s)**;

    (1)     owns or controls at least thirty three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

    (2)     has the right, by contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty three percent (33%) of those persons described in (L)(1) above.

(M)     "**Loss**" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and **Defense Expenses** in excess of the Retention that the **Insured** is legally obligated to pay. **Loss** will not include:

    (1)     the multiplied portion of any damage award;

    (2)     fines, penalties or taxes imposed by law; or

    (3)     matters which are uninsurable under the law pursuant to which this Policy is construed.

**NOTE**: With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured**, punitive damages are insurable under applicable law the Insurer will not dispute the written opinion of counsel for the Insured.

(N)     "**Non-Profit Entity**" means a corporation or organization other than the **Company**, which is exempt from taxation under Section 501 (c)(3), (4) and (10) of the Internal Revenue Code as amended or any rule or regulation promulgated thereunder.

(O)     "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(P)     "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(Q)     "**Securities Claim**" means a **Claim** made against an Insured for:

    (1)     any actual or alleged violation of the Securities Act of 1933 as amended, the Securities Exchange Act of 1934 as amended, any similar federal or state statute or any rules or regulations promulgated thereunder; or

    (2)     any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

(R)     "**Subsidiary**" means any entity during any time in which the **Parent Company** owns, directly or through one or more **Subsidiary(s)**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

(S)     "**Wrongful Act**" means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured Person** while acting in his or her capacity as an:

    (1)     **Insured Person** of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary**;

(2)    **Insured Person** of the **Company** who at the specific written request of the **Company** is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**; or

(3)    **Insured Person** of the **Company**, who at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**.

## III.    EXCLUSIONS

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured Person**, or with respect to INSURING AGREEMENT (C), the **Company**:

(A)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (A) will not apply to any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of an **Employment Practices Claim** for an **Employment Practices Wrongful Act**;

(B)    for any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste. With respect to a Claim made under INSURING AGREEMENT (A) only, this EXCLUSION (B) will not apply to a **Claim** unless a court of competent jurisdiction specifically determines the **Company** is not permitted to indemnify the **Insured Person**;

**NOTE**: EXCLUSIONS (A) and (B) above will not apply with respect to a **Securities Claim** brought by a security holder of the **Company**, or a derivative action brought by or on behalf of, or in the name or right of, the **Company,** and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an **Insured**.

(C)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation;

(D)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6 of the Declarations;

(E)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(F)    brought about or contributed to in fact by any:

(1)    intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

(2)    profit or remuneration gained by any Insured to which such Insured is not legally entitled;

as determined by a final adjudication in the underlying action or in a separate action or proceeding;

(G)    by, on behalf of, or at the direction of the **Company**, except and to the extent such **Claim**:

(1)    is brought derivatively by a security holder of the **Company** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or

intervention of an **Insured Person** or the **Company**; or

(2)     is brought by the Bankruptcy Trustee or Examiner of the **Company** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company**;

(H)     by, on behalf of, at the direction of or in the name or right of any Non-Profit Entity or Joint Venture against an Insured Person for a Wrongful Act or Employment Practices Wrongful Act while acting in his or her capacity as a director, officer, trustee, regent or governor of such, or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an Insured Person of the Company, regardless of the name or title by which such position is designated; or

(I)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an **Insured Person** acting in their capacity as a **Insured Person** of any entity other than the **Company, Non-Profit Entity** or **Joint Ventur**e.

No conduct of any **Insured Person** will be imputed to any other Insured to determine the application of any of the above EXCLUSIONS.

## IV.     LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)     The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3 of the Declarations.

(B)     The amount set forth in ITEM 3 of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C)     With respect to the Company's indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

(D)     The Retention applicable to INSURING AGREEMENT (B) shall apply to any **Loss** as to which indemnification by the **Company, Non-Profit Entity** or **Joint Venture** is legally permissible, whether or not actual indemnification is made unless such indemnification is not made by the **Company, Non-Profit Entity** or **Joint Venture** solely by reason of its financial insolvency. In the event of financial insolvency, the Retention(s) applicable to INSURING AGREEMENT (A) shall apply.

(E)     If different retentions are applicable to different parts of any **Loss**, the applicable Retention(s) will be applied separately to each part of such Loss, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

(F)     Notwithstanding the foregoing, solely with respect to a **Securities Claim**, no **Retention** shall apply to such **Claim** and the **Insurer** will reimburse those **Defense Expenses** incurred by the **Insured** if:

(1)     the **Securities Claim** is dismissed, or there is a stipulation to dismiss the **Securities Claim**, with or without prejudice and without the payment of any monetary consideration by the **Insured**;

(2)     there is a final judgment of no liability obtained prior to or during trial, in favor of the **Insured**, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or

(3)     there is a final judgment of no liability obtained after trial, in favor of the Insured, after the exhaustion of all appeals.

Any reimbursement in the case of (F)(1), (2), or (3) above will only occur if ninety (90) days after the date of dismissal, stipulation, final judgment of no liability is obtained and only if:

(a)     the same **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is not brought again within that time; and

(b)     the **Insured** provides the Insurer with an Undertaking in a form acceptable to the Insurer that

such reimbursement of the applicable Retention(s) will be paid back to the Insurer in the event the **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is brought after the ninety (90) day period.

## V.   DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A)   It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim** under this Policy.

(B)   No **Insured** may incur any **Defense Expenses** or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld.

(C)   Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis in excess of the applicable Retention, if any, before the disposition of the **Claim** for which this policy provides coverage. As a condition of the advancement of **Defense Expenses**, the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will guarantee the repayment of any **Loss** including **Defense Expenses** paid to or on behalf of the Insured if it is finally determined that the **Loss** incurred is not covered under this Policy.

(D)   If both **Loss** covered by this Policy and Loss not covered by this Policy are incurred, either because a **Claim** made against the Insured contains both covered and uncovered matters, or because a **Claim** is made against both the Insured and others (including the **Company** for **Claims** other than **Securities Claims**) not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of Loss that is covered under this Policy and that portion of Loss that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the Insured and others.

(E)   In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.   GENERAL CONDITIONS

(A)   **NOTICE**

    (1)   As a condition precedent to any right to payment under this Policy with respect to any **Claim**, the **Insured** shall give written notice to the Insurer of any Claim as soon as practicable after it is first made.

    (2)   If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** and if, during the **Policy Period**, the Insured:

        (a)   provides the Insurer with written notice of the specific **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, the circumstances by which the Insured first became aware of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**; and

        (b)   requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act**;

    then any **Claim** subsequently made arising out of such **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** will be treated as if it had been first made during the **Policy Period.**

    (3)   All notices under GENERAL CONDITIONS (A)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations; Attention: Claim Department.

**(B)    INTERRELATED CLAIMS**

All **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim** is made or deemed to have been made pursuant to GENERAL CONDITIONS (A)(1) above or GENERAL CONDITIONS (A)(2), if applicable.

**(C)    OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES**

(1)    All **Loss** payable under this Policy will be specifically excess of and will not contribute with any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy. This Policy will not be subject to the terms of any other insurance policy.

(2)    All coverage under this Policy for **Loss** from **Claims** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of their service as such.

**(D)    MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)**

(1)    If during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage shall be provided for any **Loss** involving a **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** occurring after the consummation of the transaction.

(2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the entity, assets, **Subsidiary** or liabilities so acquired or so assumed, exceed thirty five percent (35%) of the total assets or liabilities of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any **Loss** involving a **Claim** for a **Wrongful Act**, **Company Wrongful Act**, or **Employment Practices Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond the ninety (90) day period will be provided only if:

(a)    the Insurer receives written notice containing full details of the transaction(s); and

(b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)    With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity, asset, **Subsidiary** or liability as described in (D)(1) and (2) above, there will be no coverage available under this Policy for **Claims** made against the acquired, assumed, merged, or consolidated entity, asset, **Subsidiary**, liability, or **Insured Person** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed any time during which such entity, asset, liability or **Subsidiary** is not an **Insured**.

(4)    If during the **Policy Period** any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

(5)    If, during the **Policy Period**, there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

(a)    coverage will cease with respect to any **Claim** for a **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** committed subsequent to the **Change In Control**; and

(b)     the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control.**

## (E)     CANCELLATION AND RENEWAL OF COVERAGE

(1)     Except for the nonpayment of premium, as set forth in (E)(2) below, the Parent Company has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)     The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured,** if applicable.

(3)     The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

## (F)     OPTIONAL EXTENSION PERIOD

(1)     If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** shall have the right, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any **Claim** first made during the period of time set forth in ITEM 5 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act**, **Company Wrongful Act**, or **Employment Practices Wrongful Act**, occurring prior to the Policy Expiration Date.

(2)     As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full. The right of the **Parent Company** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)     If the **Parent Company** elects to purchase the Optional Extension Period as set forth in (F)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)     The purchase of the Optional Extension Period will not in any way increase the Limit Of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims** made during the **Policy Period.**

## (G)     ASSISTANCE, COOPERATION AND SUBROGATION

(1)     The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and further agree that they will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery.

(2)     In the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the **Insured**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in their name, and will provide all other assistance and cooperation which the Insurer may reasonably require.

## (H) EXHAUSTION

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss,** the premium as set forth in ITEM 8 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind

whatsoever under this Policy.

**(I)   REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are material to the risk assumed and form the basis of this Policy. No knowledge or information possessed by any Insured will be imputed to any other Insured except for material facts or information known to the person(s) who signed the Application. In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

**(J)   ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

(1)   No action may be taken against the Insurer unless, as a condition precedent thereto:

   (a)   there has been full compliance with all of the terms and conditions of this Policy; and

   (b)   the amount of the obligation of the **Insured** has been finally determined either by judgment against the Insured after actual trial, or by written agreement of the **Insured**, the claimant and the Insurer.

(2)   Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the Insurer to determine their liability, nor may the **Insured** implead the Insurer in any **Claim**.

(3)   Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

(4)   Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations may only be waived or changed by written endorsement.

**(K)   AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect to:

(1)   the payment of the premiums;

(2)   the receiving of any return premiums that may become due under this Policy;

(3)   the giving of all notices to the Insurer as provided herein; and

(4)   the receiving of all notices from the Insurer.

**(L) ENTIRE AGREEMENT**

The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.



# EXHIBIT B



333 S Wabash Ave, Chicago, IL 60604

November 15, 2016

Michael A. Becker
AON RISK SERVICES CENTRAL,INC.
200 E. RANDOLPH ST.
CHICAGO, IL 60601

Re:     Calamos Asset Management, Inc.
        Excess Products
        Policy Number 268154065
        Expiration Date: 10/27/2017

Dear Mr. Becker,

We are pleased to enclose Policy Number 268154065 for Calamos Asset Management, Inc.. We trust that this policy meets with the specifications outlined in our quotation (number 6156301801).  Please review it carefully to confirm this. Should you detect any problem, please contact me as soon as possible.

If commissions or other compensation are payable hereunder, Insurance Producer will comply with all applicable federal and state laws, rules, regulations and/or orders governing disclosure by an agent, broker or producer to an insured or prospective insured of commissions or other compensation.

We appreciate the opportunity to do business with Calamos Asset Management, Inc. and with you.  If you should have any comments, questions, or concerns, please do not hesitate to contact me.

Sincerely,

*Kyle Markovits*

Kyle Markovits
Underwriting Consultant
Phone: (312) 822-5981
kyle.markovits@cna.com



«rocessAddress»



**DECLARATIONS**
**EXCESS INSURANCE POLICY**

| ACCOUNT NUMBER | 232598 |
|---|---|
| COVERAGE PROVIDED BY (hereafter Insurer) | Continental Casualty Company |
| POLICY NUMBER | 268154065 |

| Item 1: NAMED ENTITY AND PRINCIPAL ADDRESS | PRODUCER |
|---|---|
| Calamos Asset Management, Inc.<br>2020 Calamos Court<br>Naperville, IL 60563 | AON RISK SERVICES CENTRAL,INC.<br>200 E. RANDOLPH ST.<br>CHICAGO, IL 60601 |
| n: | Michael A. Becker |

**Item 2. Policy Period:**   10/27/2016  To  10/27/2017

12:01 a.m. Standard Time at the Principal Address stated in Item 1.

**Item 3. Limit of Liability**

$10,000,000 maximum aggregate Limit of Liability under the Policy

**Item 4.** Schedule of **Underlying Insurance:**
   A. **Followed Policy**

| Name of Carrier | Policy No | Limits | Ded/Ret Amount |
|---|---|---|---|
| XL Specialty Insurance Company | ELU146965-16 | $10,000,000 | $500,000 |

   B. **Underlying Excess Policies**:

**Item 5.** Policy Premium       $144,000

**Item 6.** Notices of Claims:

CNA – Claims Reporting
P.O Box 8317
Chicago, IL 60680-8317
Email address: SpecialtyNewLoss@cna.com
Fax Number: 866-773-7504

All other Notices:

Open Brokerage Global Specialty Lines
CNA Insurance Company
125 Broad Street – 8th Floor
New York, NY 10004

**Item 7.** Endorsements forming a part of this Policy at inception:
   GSL-23282-IL, GSL-29520-XX, GSL-22799-XX, GSL-31182-XX, GSL-23504-XX, CNA-81753-XX, CNA-81758-XX

These Declarations, along with the completed and signed Application, the Policy, and any written endorsements attached thereto shall constitute the contract between the Insureds and the Insurer.

Authorized Representative:                              Date:    November 15, 2016

2076-B(c) (ED. 06-10)                       1
© CNA  All Rights Reserved.



*rocessAddress»*

## UNDERLYING EXCESS POLICY SCHEDULE

**me of Carrier**                              **Policy No.**     **Limits**     **Excess of**

А

© CNA  All Rights Reserved.



**EXCESS INSURANCE POLICY**

**Words defined in the Followed Policy have the same meaning in this Policy even if not defined herein. In consideration of the payment of the premium and in reliance upon the applications submitted to the Insurer or any insurer of the Underlying Insurance, and any other material submitted in connection with such applications (all of which are deemed attached hereto and made a part hereof) the Insurer and the Insureds agree as follows:**

## I. FOLLOW-FORM EXCESS COVERAGE

The Insurer shall provide coverage in accordance with all of the terms, conditions and limitations (including, but not limited to the exclusions and notice requirements) of the policy scheduled in Item 4.A. of the Declarations (hereafter "**Followed Policy**") except as otherwise set forth herein. Coverage hereunder shall attach only after all of the aggregate Limits of Liability, as set forth in Item 4. of the Declarations have been exhausted through payment of covered loss under all policies scheduled in Item 4. of the Declarations (hereafter "**Underlying Insurance**") by or on behalf of the insurers of such **Underlying Insurance**, or by or on behalf of the Insureds. The risk of uncollectibility of any **Underlying Insurance** (in whole or in part), whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the Insureds and is not insured by or assumed by the Insurer.

## II. LIMIT OF LIABILITY

The amount set forth in Item 3. of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer for all loss under this Policy, regardless of the number of claims made against the Insureds or the time of payment and regardless of whether or not an extended reporting period applies. If the Limit of Liability under this Policy is exhausted by payment of loss, the Insurer's obligations under this Policy shall be deemed completely fulfilled and extinguished.

## III. CHANGES TO UNDERLYING INSURANCE/DEPLETION OF SUB-LIMITS

If, subsequent to the inception date of this Policy, there is a change to any **Underlying Insurance** which expands coverage, then this Policy shall become subject to such change only if the Insurer agrees thereto by written endorsement to this Policy. If any loss under any **Underlying Insurance** is subject to a sub-limit, then this Policy provides no coverage excess of such **Underlying Insurance** sub-limit, but the **Underlying Insurance** shall be deemed depleted by payment of any such sub-limit.

## IV. INSURER RIGHTS/COOPERATION CLAUSE

The Insurer has the same rights and protections as has the insurer of the **Followed Policy** and has the right, but not the obligation, at its sole discretion, to elect to participate in the investigation, settlement, prosecution or defense of any claim reasonably likely to attach to and be covered under this Policy or any **Underlying Insurance**, even if the **Underlying Insurance** has not been exhausted. The Insureds shall cooperate with the Insurer in such investigation, settlement, prosecution or defense and shall do nothing that prejudices the Insurer's position or rights of recovery.

## V. NOTICES

Where notice is permitted or required by the **Followed Policy**, the Insureds have the same rights and obligations to notify the Insurer under this Policy, except that such notice shall be given to the Insurer at the applicable address specified in Item 6. of the Declarations.

IN WITNESS WHEREOF, the Insurer has caused this Policy to be executed by its Chairman and Secretary, but this Policy shall not be binding upon us unless completed by the attachment of the Declarations:

Chairman                                   Secretary

© CNA  All Rights Reserved.



## AMENDATORY ENDORSEMENT - ILLINOIS

It is hereby agreed that the following amendments are made to the Excess Insurance Policy [Form G-22075-B]:

1. The policy is amended by the addition of the following:

### CANCELLATION AND NON-RENEWAL

A. **CANCELLATION**

1. The Insureds may cancel this Policy at any time. To do so, the Insured must return this Policy to the Insurer or any of its authorized representatives, indicating the effective date of cancellation; or provide a written notice to the Insurer, stating when the cancellation is to be effective.

2. If this Policy has been in effect for less than sixty (60) days the Insurer may cancel this Policy for any reason by mailing written notice to the Insured, at the last mailing address known to the Insurer, at least:

   a. ten (10) days before the effective date of cancellation, if the Insurer cancels for nonpayment of premium; or
   b. thirty (30) days before the effective date of cancellation, if the Insurer cancels for any other reason.

3. If this Policy has been in effect for sixty (60) days or more, the Insurer may not cancel this Policy unless such cancellation is based on one or more of the following reasons:

   a. Nonpayment of premium.
   b. This Policy was obtained through a material misrepresentation.
   c. Any Insured violated the terms and conditions of this Policy.
   d. The risk originally accepted has measurably increased.
   e. Certification to the Director of the loss of reinsurance by the Insurer which provided coverage to the insurer for all or a substantial part of the underlying risk insured.
   f. A determination by the Director that the continuation of this Policy could place the Insurer in violation of the insurance laws of this State.
   g. Cancellation of any of the **Underlying Insurance** where; such cancellation is based on any of the reasons noted above; and such **Underlying Insurance** is not replaced without lapse.

   The Insurer will mail written notice to the Insured, at the last mailing address known to the Insurer, at least:

   i. ten (10) days before the effective date of cancellation, if the Insurer cancels for the reason set forth in subsection 3.a.; or
   ii. sixty (60) days before the effective date of cancellation, if the Insurer cancels for any reason set forth in subsections 3.b. through 3.g.

4. The notice will state the actual reason for the cancellation.

5. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

6. Proof of mailing will be sufficient proof of notice.

7. An exact and unaltered copy of such notice will also be sent to the Insured's broker, if known, or the agent of record and to the mortgagee or lienholder, at the last mailing address known to the Insurer.

GSL23282IL (12-10)
Page 1
Continental Casualty Company
Insured Name: Calamos Asset Management, Inc.

Policy No:   268154065
Endorsement No:   1
Effective Date:   10/27/2016

© CNA  All Rights Reserved.



B.   **NON-RENEWAL**

1.   The Insurer can non-renew this Policy by mailing written notice to the Insured, at the last mailing address known to the Insurer, at least sixty (60) days prior to the end of the policy period.

2.   The notice of non-renewal will state the actual reason for non-renewal.

3.   Proof of mailing will be sufficient proof of notice.

4.   An exact and unaltered copy of such notice will also be sent to the Insured's broker, if known, or the agent of record and to the mortgagee or lienholder, at the last mailing address known to the Insurer.

C.   **CONDITIONAL RENEWAL**

1.   The Insurer may not increase the renewal premium by 30% or more nor impose changes in deductible or coverage that materially alter the policy, unless the Insurer has mailed to the Insured, at the last mailing address known to the Insurer, written notice of such increase or change at least sixty (60) days prior to the renewal or anniversary date.

2.   If notice is mailed, proof of mailing will be sufficient proof of notice.

3.   An exact and unaltered copy of such notice will also be sent to the Insured's broker, if known, or the agent of record and to the mortgagee or lienholder, at the last mailing address known to the Insurer.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

GSL23282IL (12-10)
Page 2
Continental Casualty Company
Insured Name: Calamos Asset Management, Inc.

Policy No:   268154065
Endorsement No:   1
Effective Date:   10/27/2016

© CNA  All Rights Reserved.



## STATE AMENDATORY INCONSISTENT

In consideration of the premium paid for this Policy, it is understood and agreed that in the event there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy, then, where permitted by law, the Insurer shall apply those terms and conditions of either the amendatory endorsement or the Policy which are more favorable to the Insureds.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

---

GSL29520XX (3-11)
Page 1
Continental Casualty Company
Insured Name: Calamos Asset Management, Inc.

Policy No:        268154065
Endorsement No:   2
Effective Date:   10/27/2016

© CNA  All Rights Reserved.



**RECOGNITION OF EXCESS AND DIFFERENCE-IN-CONDITIONS PAYMENTS**

In consideration of the premium paid, it is understood and agreed that Section **I. FOLLOW FORM EXCESS COVERAGE**, the second sentence is deleted in its entirety and replaced as follows:

> Coverage hereunder shall attach only after all of the aggregate Limits of Liability, as set forth in Item 4. of the Declarations have been exhausted through payment of covered loss under all policies scheduled in Item 4. of the Declarations (hereafter "**Underlying Insurance**") by or on behalf of the insurers of such **Underlying Insurance**, by or on behalf of any "DIC Insurer" or by or on behalf of the Insureds.

> As used herein, a "DIC Insurer" means any insurer providing excess drop down difference in condition coverage written over this Policy including, but not limited to, any A-Side Policy issued to the Named Entity.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

GSL22799XX (12-10)
Page 1
Continental Casualty Company
Insured Name: Calamos Asset Management, Inc.

Policy No: 268154065
Endorsement No: 3
Effective Date: 10/27/2016

© CNA  All Rights Reserved.



## AMEND MAINTENANCE OF THE TERMS
## AND CONDITIONS OF UNDERLYING INSURANCE
### (Agreed To In Writing)

In consideration of the premium charged, it is understood and agreed that Section III. **CHANGES TO UNDERLYING INSURANCE/DEPLETION OF SUB-LIMITS** is deleted and replaced as follows:

> If, subsequent to the inception date of this Policy, there is a change to any **Underlying Insurance** which expands coverage, then this Policy shall become subject to such change only if the Insurer agrees thereto in writing. If any loss under any **Underlying Insurance** is subject to a sub-limit, then this Policy provides no coverage excess of such **Underlying Insurance** sub-limit, but the **Underlying Insurance** shall be deemed depleted by payment of any such sub-limit.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

GSL31182XX (3-11)
Page 1
Continental Casualty Company
Insured Name: Calamos Asset Management, Inc.

Policy No:  268154065
Endorsement No:  4
Effective Date:  10/27/2016

© CNA  All Rights Reserved.



**AMEND COOPERATION PROVISION ENDORSEMENT**
**(Clarify Imputation of Failure to Cooperate)**

In consideration of the premium paid for this Policy, it is understood and agreed that Section **IV. INSURER RIGHTS/COOPERATION CLAUSE** is amended to add the following at the end:

The failure of any Insured to cooperate with the Insurer shall not be imputed to any other cooperating Insured person.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

GSL23504XX (12-10)
Page 1
Continental Casualty Company
Insured Name: Calamos Asset Management, Inc.

Policy No:      268154065
Endorsement No:  5
Effective Date:  10/27/2016

© CNA  All Rights Reserved.



### CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM
### ENDORSEMENT

It is understood and agreed as follows:

Whenever used in this endorsement, 1) "we" means the insurer listed on Declarations or the Certificate of Insurance, as applicable; and 2) "you" means the first person or entity named on the Declarations or the Certificate of Insurance, as applicable.

**A.    Cap on Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the Terrorism Risk Insurance Act, as extended and reauthorized (the "Act"). The criteria contained in the Act for a "certified act of terrorism" include the following:

   **1.**   The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   **2.**   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**B.    Application of Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Policy, such as losses excluded by the Nuclear Hazard Exclusion or the War And Military Action Exclusion.

All other terms and conditions of the Policy remain unchanged.

This endorsement, which forms a part of and is for attachment to the Policy issued by the designated Insurers, takes effect on the effective date of said Policy at the hour stated in said Policy, unless another effective date is shown below, and expires concurrently with said Policy.

CNA81753XX (3-15)
Page 1
Continental Casualty Company
Insured Name: Calamos Asset Management, Inc.

| | | |
|---|---|---|
| Policy No: | 268154065 | |
| Endorsement No: | 6 | |
| Effective Date: | 10/27/2016 | |

© CNA  All Rights Reserved.



# IMPORTANT INFORMATION

## NOTICE – OFFER OF TERRORISM COVERAGE; DISCLOSURE OF PREMIUM

**THIS NOTICE DOES NOT FORM A PART OF THE POLICY, GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

As used herein, 1) "we" means the insurer listed on the Declarations or the Certificate of Insurance, as applicable; and 2) "you" means the first person or entity named on the Declarations or the Certificate of Insurance, as applicable.

You are hereby notified that under the Terrorism Risk Insurance Act, as extended and reauthorized ("Act"), you have a right to purchase insurance coverage of losses arising out of acts of terrorism, as defined in Section 102(1) of the Act, subject to all applicable policy provisions. The Terrorism Risk Insurance Act established a federal program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks.

This Notice is designed to alert you to coverage restrictions and to certain terrorism provisions in the policy. If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) apply.

CHANGE IN THE DEFINITION OF A CERTIFIED ACT OF TERRORISM

The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. Originally, the Act provided that to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States. However, the 2007 re-authorization of the Act removed the requirement that the act of terrorism must be committed by or on behalf of a foreign interest, and now certified acts of terrorism may encompass, for example, a terrorist act committed against the United States government by a United States citizen, when the act is determined by the federal government to be "a certified act of terrorism."

In accordance with the Act, we are required to offer you the ability to purchase coverage for losses resulting from an act of terrorism that is certified under the federal program. The other provisions of this policy, including nuclear, war or military action exclusions, will still apply to such an act.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The Department of the Treasury will pay a share of terrorism losses insured under the federal program. In 2015, the federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention, and shall decrease by 1 percentage point per calendar year until equal to 80%.

LIMITATION ON PAYMENT OF TERRORISM LOSSES

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

---

 Copyright CNA All Rights Reserved.



**Policy Holder Notice – Countrywide**

Further, this coverage is subject to a limit on our liability pursuant to the federal law where, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

CONFIRMATION OF ACCEPTANCE OF COVERAGE

In accordance with the Act, we offered you coverage for losses resulting from an act of terrorism that is certified under the federal program. This notice confirms that you have chosen to accept our offer of coverage for certified acts of terrorism. The policy's other provisions, including nuclear, war or military action exclusions, will still apply to such an act. The premium charge for terrorism coverage, if any, is shown separately on the Declarations or the Certificate of Insurance, as applicable.

  Copyright CNA All Rights Reserved.



# EXHIBIT C



**TRAVELERS**

**November 15, 2016**

**Calamos Asset Management, Inc.**
**2020 Calamos Court**
**Naperville, IL 60563**

Re: Important Information about **Claims Information Line**

Dear  **Calamos Asset Management, Inc.**

Travelers Bond & Specialty Insurance is pleased to announce its **1-800-842-8496** Claims Information Line.  This line is designed to provide insureds with an additional resource on how to report claims or those circumstances or events which may become claims.

Policyholders will be able to obtain assistance on the following topics from the Claims Information Line:

·The information that needs to be included with the claim notice

·The address, electronic mail address and/or facsimile number to which the policyholder can send claims related information

· Get questions on the claim process answered

The Declarations Page of your policy sets forth where you should report claims and claims related information.  You should also review the policy's reporting requirements to be aware of how much time you have to report a claim to Travelers.  The sooner Travelers is notified, the sooner we can become involved in the process and offer assistance to our policyholder.  A delay in reporting may result in all or part of a matter to fall outside of the coverage provided.

The Claims Information Line should streamline the claim reporting process and allow policyholders to ask questions on what information is needed as well as other questions which will assist them in working with Travelers.  While the Claims Information Line provides policyholders a valuable resource by answering questions and providing information, the line does not replace the reporting requirements contained in the Policy.

We hope this improvement to customer service is something our policyholders will find helps them understand the claim process and provides them a resource for reporting.

Best regards,
**Marie E Francis**

# IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND
# BROKER COMPENSATION

For information on how Travelers compensates independent agents, brokers, or other insurance producers, please visit this website: www.travelers.com/w3c/legal/Producer_Compensation_Disclosure.html

If you prefer, you can call the following toll-free number: 1-866-904-8348. Or you can write to us at Travelers, Agency Compensation, One Tower Square, Hartford, CT 06183.

# ILLINOIS RELIGIOUS FREEDOM PROTECTION AND CIVIL UNION ACT NOTICE

**NO COVERAGE IS PROVIDED BY THIS NOTICE. THIS NOTICE DOES NOT AMEND ANY PROVISION OF YOUR POLICY. YOU SHOULD REVIEW YOUR ENTIRE POLICY CAREFULLY FOR COMPLETE INFORMATION ON THE COVERAGES PROVIDED AND TO DETERMINE YOUR RIGHTS AND DUTIES UNDER YOUR POLICY. PLEASE CONTACT YOUR AGENT OR BROKER IF YOU HAVE ANY QUESTIONS ABOUT THIS NOTICE OR ITS CONTENTS. IF THERE IS ANY CONFLICT BETWEEN YOUR POLICY AND THIS NOTICE, THE PROVISIONS OF YOUR POLICY PREVAIL.**

The Illinois Religious Freedom Protection and Civil Union Act provides that persons of the same or opposite sex who enter into a civil union must be afforded the same obligations, protections, and legal rights as married persons. This law became effective June 1, 2011, and is designed to ensure that civil unions and marriage are treated identically under Illinois law. In accordance with law, this policy will be interpreted to provide the same benefits and protections to persons in a civil union or in a marriage.

© 2012 The Travelers Indemnity Company. All rights reserved.


**TRAVELERS**

**SelectOne+** SM

*EXCESS POLICY*
*DECLARATIONS*

POLICY NO.   106619456

### Travelers Casualty and Surety Company of America
### Hartford, Connecticut
(A Stock Insurance Company, herein called the Company)

**PLEASE READ THIS POLICY CAREFULLY. THIS POLICY IS WRITTEN ON A CLAIMS-MADE BASIS WHEN EXCESS OF A LIABILITY COVERAGE AND COVERS ONLY CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF EXERCISED, ANY EXTENDED DISCOVERY PERIOD. THIS POLICY IS WRITTEN ON A LOSS FIRST DISCOVERED BASIS WHEN EXCESS OF A BOND OR CRIME POLICY AND COVERS ONLY LOSS FIRST DISCOVERED DURING THE POLICY PERIOD OR, IF EXERCISED, ANY EXTENDED DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS.**

| ITEM 1 | INSURED AND INSURED'S ADDRESS: |
|---|---|
| | **Calamos Asset Management, Inc.**<br>**2020 Calamos Court**<br>**Naperville, IL 60563**<br>Policy Number:<br>**106619456**<br><br>Prior Policy Number:<br>**15T13443** |
| ITEM 2 | **POLICY PERIOD:**<br><br>From: 12:01 A.M **October 27, 2016**     To: 12:01 A.M **October 27, 2017**<br>Local time at the address shown in ITEM 1. |
| ITEM 3 | **LIMIT OF LIABILITY:**<br><br>**$10,000,000** |
| ITEM 4 | **FOLLOWED POLICY:**<br>Insurer:       **XL Specialty Insurance Company**<br>Policy Number:       **ELU146965-16**<br>Coverage Sections:       **Directors and Officers Liability - ABC** |

| ITEM 5 | SCHEDULE OF UNDERLYING INSURANCE: |
|---|---|

| | Coverage Sections | Policy Number | Policy Period | Limit of Liability | Retention Amount |
|---|---|---|---|---|---|
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| (A) Issuer of Primary Policy: | | | | | |
| XL Specialty Insurance Company | Directors and Officers Liability - ABC | ELU146965-16 | 10/27/2016 to 10/27/2017 | $10,000,000 | $500,000 |
| | | | | | |
| (B) Other Underlying Insurers: | | | | | |
| Continental Casualty Company | Directors and Officers Liability - ABC | 268154065 | 10/27/2016 to 10/27/2017 | $10,000,000 | N/A |
| | | | | | |

(C)   Total Amount of Underlying Limit of Liability  **$20,000,000**  plus any applicable retentions  or deductibles under the Primary Policy.

| ITEM 6 | **PREMIUM FOR THE POLICY PERIOD:**<br><br>**$93,610.00**       Policy Premium |
|---|---|
| **ITEM 7** | **EXTENDED DISCOVERY PERIOD:**<br><br>(a)    Additional Premium:          **175 %**  of Premium indicated in Item 6<br>(b)    Additional Months:          **12** |
| **ITEM 8** | **ENDORSEMENTS EFFECTIVE AT INCEPTION:**<br><br>**AFE-19008-0115; XP001-0205; XP-10391-1215; XP133-0109** |
| **ITEM 9** | **ALL NOTICES OF CLAIM OR LOSS MUST BE SENT TO THE COMPANY BY EMAIL, FACSIMILE, OR MAIL AS SET FORTH BELOW:**<br><br>**Email:BSIclaims@travelers.com**<br>**FAX:(888) 460-6622**<br>**Mail:Travelers Bond & Specialty Insurance Claim**<br>       **385 Washington St. – Mail Code 9275-NB03F**<br>       **St Paul, MN  55102** |

_____
Countersigned By

IN WITNESS WHEREOF, the Company has caused this policy to be signed by its authorized officers.

President, Bond & Specialty Insurance                    Corporate Secretary

## FEDERAL TERRORISM RISK INSURANCE ACT
## DISCLOSURE ENDORSEMENT

This endorsement applies to the insurance provided under any Coverage Part or coverage Form included in this policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended.

The federal Terrorism Risk Insurance Act of 2002 as amended ("TRIA"), establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in TRIA) caused by "Acts Of Terrorism" (as defined in TRIA). Act Of Terrorism is defined in Section 102(1) of TRIA to mean any act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for such Insured Losses is established by TRIA and is a percentage of the amount of such Insured Losses in excess of each Insurer's "Insurer Deductible" (as defined in TRIA), subject to the "Program Trigger" (as defined in TRIA). Through 2020, that percentage is established by TRIA as follows:

- 85% with respect to such Insured Losses occurring in calendar year 2015.
- 84% with respect to such Insured Losses occurring in calendar year 2016.
- 83% with respect to such Insured Losses occurring in calendar year 2017.
- 82% with respect to such Insured Losses occurring in calendar year 2018.
- 81% with respect to such Insured Losses occurring in calendar year 2019.
- 80% with respect to such Insured Losses occurring in calendar year 2020.

In no event, however, will the Federal Government be required to pay any portion of the amount of such Insured Losses occurring in a calendar year that in the aggregate exceeds $100 billion, nor will any Insurer be required to pay any portion of such amount provided that such Insurer has met its Insurer Deductible. Therefore, if such Insured Losses occurring in a calendar year exceed $100 billion in the aggregate, the amount of any payments by the Federal Government and any coverage provided by this policy for losses caused by Acts Of Terrorism may be reduced.

For each coverage provided by this policy that applies to such Insured Losses, the charge for such Insured Losses is no more than one percent of your premium, and does not include any charge for the portion of such Insured Losses covered by the Federal Government under TRIA. Please note that no separate additional premium charge has been made for the terrorism coverage required by TRIA. The premium charge that is allocable to such coverage is inseparable from and embedded in your overall premium.

© 2015 The Travelers Indemnity Company.  All rights reserved.


**TRAVELERS**

## *SelectOne*⁺ˢᴹ

### *EXCESS POLICY*

*IMPORTANT NOTE: PLEASE READ THIS POLICY CAREFULLY. THIS POLICY IS WRITTEN ON A CLAIMS-MADE BASIS WHEN EXCESS OF A LIABILITY COVERAGE AND COVERS ONLY CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF EXERCISED, ANY EXTENDED DISCOVERY PERIOD. THIS POLICY IS WRITTEN ON A LOSS FIRST DISCOVERED BASIS WHEN EXCESS OF A BOND OR CRIME POLICY AND COVERS ONLY LOSS FIRST DISCOVERED DURING THE POLICY PERIOD OR, IF EXERCISED, ANY EXTENDED DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS. THIS POLICY IS NOT COMPLETE UNLESS A DECLARATIONS PAGE IS ATTACHED.*

### INSURING AGREEMENT

In consideration of the payment of the premium, and in reliance upon the completeness and accuracy of the statements and disclosures made to the Insurer and any issuer of Underlying Insurance by application, including all attachments, the Insurer agrees that this policy incorporates by reference, and affords coverage in accordance with and subject to, the insuring clauses, warranties, definitions, terms, conditions, exclusions and other provisions contained in the Followed Policy and to the extent coverage is further limited or restricted thereby, in any other Underlying Insurance, except as regards the premium, the limit of liability, the policy period, and except as otherwise provided herein. In no event shall this policy grant broader coverage than would be provided by the most restrictive Underlying Insurance.

To the extent the insuring clauses, warranties, definitions, terms, conditions, exclusions or other provisions of the Followed Policy or other Underlying Insurance are changed to limit or restrict coverage, this policy shall become subject to such changes upon the effective date of the change in the Followed Policy or such other Underlying Insurance. To the extent the insuring clauses, warranties, definitions, terms, conditions, exclusions or other provisions of the Followed Policy are changed to expand or broaden coverage, this policy shall become subject to such changes only if: (i) the Insurer has received written notice from the Insured(s) of such changes; (ii) the Insurer has given the Insured(s) its written consent to such changes; and (iii) the Insured(s) has paid any required additional premium.

### TERMS, CONDITIONS AND LIMITATIONS

#### SECTION 1.    DEFINITIONS

Wherever used in this policy:

A.    Excess Policy Limit of Liability means the Limit of Liability of this policy as stated in Item 3 of the Declarations.

B.    Followed Policy means the policy or bond listed in Item 4 of the Declarations, but only for the coverage sections listed.

C.    Insured Event means:

    1.    with respect to any Underlying Insurance that is a bond or crime coverage, a loss first discovered during the Policy Period stated in Item 2 of the Declarations by an Insured(s); and

    2.    with respect to any other Underlying Insurance that is a liability coverage, a claim first made during the Policy Period stated in Item 2 of the Declarations against an Insured(s).

D.    Insured(s) means the individuals and organizations for whom coverage is afforded hereunder.

E.    Insurer means the undersigned entity issuing this policy.

F.    Primary Policy means all of the policies or bonds identified in Item 5 (A) of the Declarations for the applicable coverage section.

G.    Underlying Insurance means all of the policies or bonds scheduled in Item 5 of the Declarations.

H.    Underlying Limits of Liability means the combined limits of liability of the Underlying Insurance as stated in Item 5(C) of the Declarations for the applicable coverage section, plus any applicable

©2009 The Travelers Companies, Inc. All Rights Reserved

retention or deductible under the applicable Primary Policy, less any reduction or exhaustion of such limits of liability as provided in Section 3(B) below.

   **I.**   Sublimit means any limit of liability of any Underlying Insurance which:

       1.   applies only to a particular type of claim, loss or coverage under such Underlying Insurance; and

       2.   is part of, and not in addition to, the applicable aggregate or other limits of liability of such Underlying Insurance.

## SECTION 2.   UNDERLYING INSURANCE

   **A.**   It is a condition precedent to the rights of the Insured(s) under this policy that the Insured(s) notify the Insurer, as soon as practicable in writing, of a failure to maintain in full force and effect, except as provided for under Section 3(B), and without alteration of any insuring clause, warranty, definition, term, condition, exclusion or other provision, limit of liability or retention amount, any Underlying Insurance.

   **B.**   Failure to maintain any of the Underlying Insurance, except as provided for under Section 3(B), shall not invalidate this policy, but the Insurer shall only be liable for covered loss under this policy to the same extent it would have been liable had the Underlying Insurance been maintained.

## SECTION 3.   ATTACHMENT AND LIMIT OF LIABILITY

   **A.**   The Insurer shall only be liable to make payment under this policy after the total amount of all Underlying Limits of Liability has been paid in legal currency by the issuers of all Underlying Insurance as covered loss thereunder.

   **B.**   In the event of the reduction or exhaustion of the total amount of all Underlying Limits of Liability solely by reason of the payment by the issuers of the Underlying Insurance of covered loss, this policy shall:

       1.   in the event of such reduction, pay covered loss excess of the reduced amount of such Underlying Limits of Liability, such amount not to exceed the Excess Policy Limit of Liability; or

       2.   in the event of such exhaustion, continue in force as primary insurance, provided always that this policy shall only pay covered loss excess over any retention or deductible amount otherwise applicable under the Primary Policy, such amount not to exceed the remaining Excess Policy Limit of Liability.

   **C.**   Any claim, loss or coverage that is subject to any Sublimit shall not be considered covered loss under this policy, but shall, for purposes of this policy, reduce or exhaust the Underlying Limit of liability to the extent such payment reduces or exhausts the aggregate limit(s) of liability of such Underlying Insurance.

   **D.**   Regardless of the number of:

       1.   Insured Events;

       2.   Insured(s); or

       3.   claimants who make a claim against any Insured(s);

     the amount set forth in Item 3 of the Declarations will be the maximum limit of liability of the Insurer, and will be the maximum amount payable by the Insurer under this policy for all covered loss (including defense costs and expenses).

   **E.**   Notwithstanding any of the terms of this policy which might be construed otherwise, the policy shall drop down only in the event of reduction or exhaustion of the Underlying Insurance as described above, and shall not drop down for any other reason including uncollectability or nonpayment, in whole or in part, of any Underlying Insurance.

   **F.**   The risk of uncollectability of any Underlying Insurance, in whole or in part, whether because of financial impairment or insolvency of any issuer of Underlying Insurance or for any other reason, is expressly retained by the Insured(s) and is not in any way, or under any circumstances, insured or assumed by the Insurer.

©2009 The Travelers Companies, Inc. All Rights Reserved

**SECTION 4.    DISCOVERY PERIOD**

The Insured(s) shall be entitled to a discovery period (which may also be called an extended reporting period, or such similar term, in the Followed Policy) pursuant to the terms and conditions in the Followed Policy. Following the cancellation or nonrenewal of this policy, the Insured(s) shall pay to the Insurer the additional premium set forth in Item 7(a). of the Declarations for the period set forth in Item 7(b) in accordance with the Followed Policy. Such discovery period is not available unless the Insured has elected the discovery period in all Underlying Insurance. The additional premium for the discovery period shall be deemed fully earned at the inception of such discovery period. The discovery period is not cancelable except for nonpayment of the additional premium. The limit of liability for such discovery period, if exercised, shall be part of, and not in addition to, the Excess Policy Limit of Liability for the Policy Period stated in Item 2 of the Declarations. The purchase of such discovery period shall not increase or reinstate the Excess Policy Limit of Liability.

**SECTION 5.    APPLICATION OF RECOVERIES**

All recoveries or payments recovered or received subsequent to a loss settlement under this policy shall be applied as if recovered or received prior to such settlement and all necessary adjustments shall then be made between the Insured(s) and the Insurer, provided always that the foregoing shall not affect the time when loss under the policy shall be payable.

**SECTION 6.    NOTICE**

**A.**    The Insured(s) shall, as a condition precedent to their rights under this policy, give the Insurer notice in writing of any claim or loss in the same time and manner required by the terms and conditions of the Followed Policy.    Notice given under the Followed Policy or Underlying Insurance shall not constitute notice under this policy.

**B.**    Notice to the Insurer of any claim, loss or circumstance shall be given as set forth in Item 9 of the Declarations.

**SECTION 7.    TERMINATION OF POLICY**

This policy shall terminate upon the earliest of the following times:

**A.**    the effective date of termination specified in a prior written notice from the Insurer to the Insured in accordance with conditions and limitations of the applicable Followed Policy;

**B.**    the effective date of termination specified in a prior written notice from the Insured to the Insurer; or

**C.**    the expiration of the Policy Period stated in Item 2 of the Declarations.

**SECTION 8.    NON-ACCUMULATION OF LIABILITY**

The Limit of Liability stated in Item 3 of the Declarations shall not be cumulative regardless of the number of periods this policy has been in force, the number of renewals of this policy by the Insurer, any extensions of the Policy Period of this Policy as stated in Item 2 of the Declarations by the Insurer, any election of a discovery period, the number of and amount of premiums paid by the Insured(s), the number of Insured Events, or the number of periods of this policy in which the acts giving rise to an Insured Event were committed or occurred.

| THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. |
|---|

## EXCESS POLICY ENDORSEMENT - RECOGNIZE PAYMENT BY ANY ENTITY

This endorsement changes the following:

**Excess Policy**

**It is agreed that:**

1.    The following replaces Item 5 (C) of the Declarations:

    (C)    Total Amount of Underlying Limit of Liability    $20,000,000.

2.    Item 7 of the Declarations is deleted.

3.    The following replaces **INSURING AGREEMENT**:

In consideration of the payment of the premium, and in reliance upon the completeness and accuracy of the statements and disclosures made to the Insurer, the Insurer agrees that this policy incorporates by reference, and affords coverage in accordance with and subject to, the insuring clauses, warranties, definitions, terms, conditions, exclusions and other provisions contained in the Followed Policy, except as regards the premium, the limit of liability, the policy period, and except as otherwise provided herein.

To the extent the insuring clauses, warranties, definitions, terms, conditions, exclusions or other provisions of the Followed Policy are changed to limit or restrict coverage, this policy shall become subject to such changes upon the effective date of the change in the Followed Policy. To the extent the insuring clauses, warranties, definitions, terms, conditions, exclusions or other provisions of the Followed Policy are changed to expand or broaden coverage, this policy shall become subject to such changes only if: (i) the insurer has received written notice from the insured(s) of such changes; (ii) the insurer has given the insured(s) its written consent to such changes; and (iii) the insured(s) has paid any required additional premium.

4.    The following replaces **SECTION 1. DEFINITIONS, D.** Insured(s) and **H.** Underlying Limits of Liability of the **TERMS, CONDITIONS AND LIMITATIONS**:

    **D.**    Insured(s) has the meaning set forth in the Followed Policy.

    **H.**    Underlying Limits of Liability means the combined limits of liability of the Underlying Insurance as stated in Item 5(C) of the Declarations for the applicable coverage section.

5.    **SECTION 1. DEFINITIONS, C.** Insured Event, **F.** Primary Policy, and **I.** Sublimit of the **TERMS, CONDITIONS AND LIMITATIONS** are deleted.

6.    The following replaces **SECTION 3. ATTACHMENT AND LIMIT OF LIABILITY** of the **TERMS, CONDITIONS AND LIMITATIONS**:

    **SECTION 3.    ATTACHMENT AND LIMIT OF LIABILITY**

    **A.**    The Insurer shall only be liable to make payment under this policy after the total amount of all Underlying Limits of Liability has been paid in legal currency by the issuers of all Underlying Insurance, any Insured(s), or any other entity as covered loss under the Underlying Insurance, and any applicable retention or deductible under the Followed Policy has been paid by or on behalf of the Insured(s).

    **B.**    In the event of the reduction or exhaustion of the total amount of all Underlying Limits of Liability by reason of the payment by the issuers of the Underlying Insurance, any Insured(s), or any other entity of covered loss, this policy shall:

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106619456**

© 2015 The Travelers Indemnity Company. All rights reserved.

1.    in the event of such reduction, pay covered loss excess of the reduced amount of such Underlying Limits of Liability, such amount not to exceed the Excess Policy Limit of Liability; or

2.    in the event of such exhaustion, continue in force as primary insurance, provided always that this policy shall only pay covered loss excess over any retention or deductible amount otherwise applicable under the Followed Policy, such amount not to exceed the remaining Excess Policy Limit of Liability.

The policy shall drop down only in the event of reduction or exhaustion of the Underlying Insurance as described above, and shall not drop down for any other reason including uncollectability or nonpayment, in whole or in part, of any Underlying Insurance.

**C.**    Any claim, loss or coverage that is subject to any sublimit in any Underlying Insurance shall not be considered covered loss under this policy, but shall, for purposes of this policy, reduce or exhaust the Underlying Limit of Liability to the extent such payment reduces or exhausts the aggregate limit(s) of liability of such Underlying Insurance.

**D.**    The amount set forth in Item 3 of the Declarations will be the maximum limit of liability of the Insurer, and will be the maximum amount payable by the Insurer under this policy for all covered loss (including defense costs and expenses).

The limit of liability for any discovery period exercised pursuant to the terms and conditions in the Followed Policy shall be part of, and not in addition to, the Excess Policy Limit of Liability for the Policy Period stated in Item 2 of the Declarations. The purchase of such discovery period shall not increase or reinstate the Excess Policy Limit of Liability. The additional premium for the discovery period shall be deemed fully earned at the inception of such discovery period. The discovery period is not cancelable except for nonpayment of the additional premium.

**E.**    The risk of uncollectability of any Underlying Insurance, in whole or in part, whether because of financial impairment or insolvency of any issuer of Underlying Insurance or for any other reason, is expressly retained by the Insured(s) and is not in any way, or under any circumstances, insured or assumed by the Insurer.

7.    **SECTION 2. UNDERLYING INSURANCE**, **SECTION 5. APPLICATION OF RECOVERIES**, and **SECTION 8. NON-ACCUMULATION OF LIABILITY** of the **TERMS, CONDITIONS AND LIMITATIONS** are deleted.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## ILLINOIS AMENDATORY ENDORSEMENT

This endorsement modifies the following:
**Excess Policy**

**It is agreed that:**

**SECTION 4. DISCOVERY PERIOD** is amended in its entirety to read as follows:

**SECTION 4.    DISCOVERY PERIOD**

The Insured(s) shall be entitled to a discovery period (which may also be called an extended reporting period, or such similar term, in the Followed Policy) pursuant to the terms and conditions in the Followed Policy.  Following the cancellation or nonrenewal of this policy, the Insured(s) shall pay to the Insurer the additional premium set forth in Item 7(a). of the Declarations for the period set forth in Item 7(b) in accordance with the Followed Policy. The additional premium for the discovery period shall be deemed fully earned at the inception of such discovery period.  The discovery period is not cancelable except for nonpayment of the additional premium. The limit of liability for such discovery period, if exercised, shall be part of, and not in addition to, the Excess Policy Limit of Liability for the Policy Period stated in Item 2 of the Declarations.  The purchase of such discovery period shall not increase or reinstate the Excess Policy Limit of Liability.  The discovery period will be for a period of no less than 12 months.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106619456**



CERTIFIED MAIL

**POTTER ANDERSON & CORROON** LLP
Hercules Plaza
1313 N. Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951

7017 1450 0001 1211 9079

Hasler     PRIORITY MAIL
09/13/2018
**US POSTAGE** $013.90º

    ZIP 19801
011D11653837

Travelers Casualty and Surety Company of America
c/o and officer, a managing or general agent
One Tower Square
Hartford, CT 06183

**Smith, Von**

| | |
|---|---|
| **From:** | Delgado,Wilma <WDELGAD1@travelers.com> |
| **Sent:** | Monday, September 17, 2018 1:49 PM |
| **To:** | TravelersSOP |
| **Subject:** | Travelers Direct 9/17/18 |
| **Attachments:** | Calamos  Asset  Management Inc v. Trav Cas and Surety Co of Ameirica(bond).pdf |

Please upload to CSC

**Wilma Delgado/Litigation Analyst/Corporate Litigation**
One Tower Square/8MS
Hartford Ct 06183
Phone: 860-954-5095

**TRAVELERS**

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.