# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CALAMOS ASSET MANAGEMENT, INC., <br><br> Plaintiff, <br><br> v. <br><br> TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, <br><br> Defendant. | C.A. No. 1:18-cv-01510-MN <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANT TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFF'S PROPOSED EXPERT WITNESSES <u>TY R. SAGALOW AND THOMAS J. ALLINGHAM, II</u>**

Francis G.X. Pileggi (Del. Bar No. 2624)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
222 Delaware Avenue, 7th Floor
Wilmington, DE 19801
(302) 655-3667
fpileggi@eckertseamans.com

OF COUNSEL:

Ronald P. Schiller (*pro hac vice*)
Daniel J. Layden (*pro hac vice*)
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
rschiller@hangley.com
dlayden@hangley.com

*Counsel for Defendant Travelers Casualty and Surety Company of America*

Dated: March 4, 2020

**TABLE OF CONTENTS**

I. NATURE AND STAGE OF PROCEEDINGS ................................................................... 1

II. LEGAL ARGUMENT............................................................................................................ 2

    A. Standard ............................................................................................................... 2

    B. Mr. Sagalow's Opinions and Testimony Fail to Satisfy *Daubert*........................... 3

        1. Mr. Sagalow's Opinions Are Irrelevant and Constitute Inadmissible Legal Conclusions................................................................................... 3

        2. Mr. Sagalow's Opinions Are Not Reliable. ............................................... 5

        3. Mr. Sagalow's Opinions Do Not Fit the Facts of this Case and Are Not Helpful to the Trier of Fact. ................................................................ 10

    C. Thomas J. Allingham's Opinion and Testimony Fail to Satisfy *Daubert* ............ 11

        1. Mr. Allingham's Opinions Are Irrelevant and Constitute Inadmissible Legal Conclusions................................................................................... 12

        2. Mr. Allingham's Opinions are Not Reliable............................................ 12

        3. Mr. Allingham's Opinions Lack the Appropriate Fit, Are Not Helpful to the Trier of Fact, and Are Not Relevant. .............................................. 14

III. CONCLUSION.................................................................................................................... 15

## TABLE OF CITATIONS

**Page(s)**

**Cases**

*American Alternative Insuance Co. v. Coyne*,
  2016 WL 801374 (N.D. Cal. Mar. 1, 2016) ............................................................................4

*Arnold v. Society for Savings Bancorp, Inc.*,
  678 A.2d 533 (Del. 1996) ........................................................................................................9

*Bar Plan Mutual Insurance Co. v. Likes Law Office*,
  44 N.E.3d 1279 (Ind. App. 2015) ................................................................................5, 6, 10

*Berckeley Investment Group, Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006) ...............................................................................................4, 13

*Burkhart v. WMATA*,
  112 F.3d 1207 (D.C. Cir. 1997) ..............................................................................................4

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
  350 F.3d 316 (3d Cir. 2003) ....................................................................................................6

*In re Dataproducts Corp. Shareholders Litigation*,
  1991 WL 165301 (Del. Ch. Aug. 22, 1991) .........................................................................10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ......................................................................................................... passim

*General Electric Co. v. Joiner*,
  522 U.S. 136 (1997) .................................................................................................................5

*Hawkins v. United States*,
  96 U.S. 689 (1877) ...................................................................................................................5

*In re Paoli Railroad Yard PCB Litigation*,
  35 F.3d 717 (3d Cir. 1994) ............................................................................................3, 5, 11

*In re Verizon Insurance Coverage Appeals*,
  222 A.3d 566 (Del. 2019),
  *reh'g denied* (Nov. 18, 2019) ..............................................................................................4, 8

*In re Wayport, Inc. Litigation*,
  76 A.3d 296 (Del. Ch. 2013) ...................................................................................................9

*Yazujian v. PetSmart*,
  729 F. App'x 213 (3d Cir. 2018) ............................................................................................3

**Statutes and Rules**

Fed. R. Evid. 702 ................................................................................................................. *passim*

Fed. R. Evid. 704 ..........................................................................................................................5


**Other Authorities**

AIG, *Legal Notice*, https://www.aig.com/legal-notice (last accessed Mar. 4, 2020) .......................8

Ty R. Sagalow, *Directors and Officers Liability Insurance: A Guide for Directors*
    (Prof. Ed.), Section 10.05..........................................................................................................8

Defendant Travelers Casualty and Surety Company of America ("Travelers") respectfully moves for the entry of an Order excluding the testimony and opinions of the proposed expert witnesses of plaintiff Calamos Asset Management, Inc. ("CAM"), Messrs. Ty R. Sagalow and Thomas J. Allingham, II.  Each purported expert offers opinions that fail to meet the admissibility requirements of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and should be excluded for the reasons described herein.

I.      NATURE AND STAGE OF PROCEEDINGS

This is an insurance coverage dispute arising from CAM's claim for loss incurred in the defense and settlement of certain underlying litigations, including a consolidated class action. Class plaintiffs alleged that, in connection with a going-private transaction initiated by CAM in 2016, CAM's controlling shareholders (the "Control Group") breached their fiduciary duties to the minority shareholders, and, in a separate count, allege that two CAM directors and officers – one of whom was also in the Control Group – breached their fiduciary duties to CAM.

As is relevant to this Motion, the parties dispute whether the claim for breach of fiduciary duties against certain CAM affiliates in the Control Group constitutes a "Securities Claim" within the meaning of the Travelers Policy.[1]  Further, the parties dispute how the claimed loss should be allocated between covered and uncovered claims, and insureds and non-insureds.

CAM has engaged Ty R. Sagalow to provide opinions and testimony on the custom and practice of the insurance industry as it relates to the interpretation of the "Securities Claim" endorsement in the Travelers Policy.  *See* Report of Ty R. Sagalow ("Sagalow Report"), attached as Exhibit A, at ¶¶ 31-33, and Reply Expert Witness Report of Ty R. Sagalow, attached as Exhibit B.  Specifically, Mr. Sagalow has opined on the history of certain director and officer's

---

[1] Unless otherwise specified, defined terms shall have the meaning ascribed to them in Travelers' March 5, 2020 Motion for Summary Judgment.

For purposes of economy, Travelers combines the briefing sections set forth in Local Civil R. 7.1.3(c)(1)(C)-(E) in this segment.

liability insurance policy forms that provide D&O coverage for entities for a "Securities Claim." Ex. A, at ¶ 33. CAM has also retained Thomas J. Allingham, II to opine on certain issues relating to allocation between covered and non-covered loss, specifically, the relative exposure of the Control Group defendants as compared to the two director and officer defendants. *See* Report of Thomas J. Allingham II ("Allingham Report"), attached as Exhibit C, at ¶ 1.

Neither purported expert should be permitted to testify in this case because their opinions are speculative, constitute impermissible legal conclusions, are not based on reliable principles or methods, and do not fit the facts of this case. Accordingly, their reports and testimony will not be helpful to the trier of fact and should be excluded.

## II. LEGAL ARGUMENT

### A. Standard

The Federal Rules of Evidence permit expert testimony as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Supreme Court has observed that Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

In determining the admissibility of expert testimony under Rule 702, a District Court must exercise a gatekeeping function. To that end, the court must conduct a three-part inquiry considering whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the

testimony assists the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or to determine a fact in issue. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994). The opinions of Messrs. Sagalow and Allingham fail to satisfy these threshold admissibility requirements.[2]

### B. Mr. Sagalow's Opinions and Testimony Fail to Satisfy *Daubert*

CAM has designated Mr. Sagalow as an expert on two subjects: (1) "insurance industry custom and practice" with respect to the development of Securities Claim coverage for entities, including how that language applies to the policies at issue here; and (2) the significance of the absence of a so-called "bump up" exclusion in the Travelers Policy.

#### 1. Mr. Sagalow's Opinions Are Irrelevant and Constitute Inadmissible Legal Conclusions.

Mr. Sagalow's opinions are a thinly-veiled effort to opine on the meaning of contract language, and thus do not satisfy threshold relevance requirements and constitute inadmissible legal conclusions. *See Yazujian v. PetSmart*, 729 F. App'x 213, 215 (3d Cir. 2018) ("*Daubert* requires an inquiry into the reliability and relevance of the proposed expert testimony.").

As explained in Travelers' Motion for Summary Judgment, the Travelers Policy – including the "Securities Claim" endorsement and the definition of "Loss" – is unambiguous and contract interpretation is a question of law reserved for the Court.[3] *See In re Verizon Insurance*

---

[2] Although Travelers does not generally object to Mr. Sagalow's qualifications, in his Reply report, Mr. Sagalow opines on allocation issues, including that "a substantial and common allegation of breach of the duty of loyalty by members of the target board" which "provides a substantial ground[] for liability and financial exposure and thus substantial coverage." Ex. B, at ¶ 30. In his deposition, Mr. Sagalow walked back this opinion, stating that he had not studied the issue in depth and was not testifying as a corporate law expert. Excerpts from T. Sagalow 2/24/2020 deposition at 127:2-128:24, attached as Exhibit D. Accordingly, Travelers moves to strike paragraph 30 of Mr. Sagalow's reply report because Mr. Sagalow is not qualified to testify as to substantive matters of Delaware corporate law, including as it applies to the relative liability of defendants in the underlying action.

[3] Extrinsic evidence of the parties' contracting intent – particularly here, where Mr. Sagalow concedes that he does not have any knowledge of parties' actual underwriting intent – is

- 3 -

*Coverage Appeals*, 222 A.3d 566, 572 (Del. 2019) (finding materially identical Securities Claim language unambiguous), *reh'g denied* (Nov. 18, 2019). The Third Circuit requires a court to "ensure that [the] expert does not testify as to the governing law of the case." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (observing that "an expert witness is prohibited from rendering a legal opinion"); *accord Burkhart v. WMATA*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge . . . ."). Yet Mr. Sagalow opines on "the custom and practice of the insurance industry with respect to the definition of Securities Claim in a directors and officers insurance policy generally as well as its specific application to claims alleging common law breach of fiduciary duty in the context of a securities transaction." Ex. A, at ¶ 31. Although he couches his opinion as "custom and practice," Mr. Sagalow is opining on the *same* issue of contract interpretation before the Court. *See id.* ¶ 33(F) (stating that "XL [the primary carrier] intended that 'Securities Claims' would include violations of common law, i.e. breaches of fiduciary duty . . .").

Because contract interpretation is unquestionably a legal issue, this Court – like several other courts before it – should exclude Mr. Sagalow's purported opinions on insurance industry "custom and practice" because they are irrelevant legal opinions. *See Am. Alternative Ins. Co. v. Coyne*, 2016 WL 801374 (N.D. Cal. Mar. 1, 2016) (granting "motion to strike the declaration of Ty R. Sagalow as speculative and consisting of improper legal conclusions. The Court does not consider the declarations relevant to the legal issues presented in the cross-motions for summary judgment. Instead, as is within its province, the Court bases its decision on an independent interpretation the contractual language of the applicable insurance policies."); *see also Bar Plan Mut. Ins. Co. v. Likes Law Office*, 44 N.E.3d 1279, 1291 (Ind. App. 2015) (concluding that trial

---

inadmissible. *See* Ex. A, ¶ 67 (observing that "I, of course, do not have personal knowledge as to what was in the actual mind of the XL underwriter…"); *see also* Ex. D, at 93:7-97:11.

- 4 -

court abused its discretion by admitting Mr. Sagalow's opinions on insurance industry custom and practice because those opinions touch "immediately upon the heart of the matter and the issue this court is prevailed upon to answer . . . and, as such, the paragraphs propone a legal conclusion.").[4]

### 2. Mr. Sagalow's Opinions Are Not Reliable.

An expert's conclusions must follow from an application of a reliable methodology, and "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Additionally, although "[a]n expert may testify as to his opinion on an ultimate issue of fact," Fed. R. Evid. 704, an expert may not, however, merely tell the jury what result to reach. *Id.*, Adv. Comm. N. (merely telling jury what result to reach is not helpful to the jury and therefore is not admissible testimony); *see also In re Paoli R.R.*, 35 F.3d at 742 ("*Daubert* explains that the language of Rule 702 requiring the expert to testify to *scientific knowledge* means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief.").

Mr. Sagalow's opinions plainly fail these basic gatekeeping requirements. First, Mr. Sagalow provides no support or source for the industry customs and practices he purports to opine on, except for vague and conclusory *ipse dixit* that he attributes to the "understanding" of the "insurance industry" as a whole. *See* Ex. A, ¶ 49 ("*It was understood* by the insurance

---

[4] Mr. Sagalow also opines on the effect that the *absence* of a so-called "bump-up" exclusion has on the meaning of the actual contract terms. *See* Ex. A, ¶¶ 32, 74-86. That opinion is inadmissible for the same reasons discussed, *supra*, as well as for the reason that the *absence* of a contract term cannot alter or invalidate the *existing* contract terms. *See, e.g.*, *Hawkins v. United States*, 96 U.S. 689, 697–98 (1877) ("[A] party cannot be bound by an implied promise, when he has made an express contract as to the same subject-matter . . . .").

- 5 -

industry that this definition of Securities Claim includes common law violations of fiduciary duty . . ."); *id.* ¶ 50 ("*[I]t was understood* by the insurance industry that the definition of Securities Claim . . . included <u>all</u> the common securities cases . . . including cases involving common law claims for breach of fiduciary duty."); *id.* ¶ 60 ("With the above history as background, *understanding the definition of 'Securities Claim' . . . becomes straightforward from a point of view of industry custom, practice and standards*.") (all italics added).

Further, the insurance industry "data" he considered as to "custom and practice" are his "education and [] knowledge of insurance industry custom and practice as it relates to the subjects discussed, gained from [his] thirty-plus years of experience [in the insurance industry]," his engagements as an expert witness in other insurance matters, and "general industry knowledge." *See* Ex. A, at ¶ 19; *see also Likes Law Office*, 44 N.E.3d at 1291 (holding it was error for trial court to admit Mr. Sagalow's opinions where "[a]lthough Sagalow claims that his opinions are derived from the insurance industry's custom and practice, nowhere in his affidavit does Sagalow clarify what these customs actually are or identify his sources therefor"); *accord Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) ("There was no literature confirming this theory, nor demonstrable tests. Lacking support, his testimony was speculative and unreliable.").

Even where Mr. Sagalow *does* identify a particular industry custom, his source for such "custom" is his own say-so. For example, Mr. Sagalow observes that "when an underwriter adds specific words to a competitor's definition which he is largely otherwise copying, especially in an endorsement, he is trying to say something . . . In this case, it is that Securities Claims include violations of common law, i.e. breaches of fiduciary duty, as respects securities transactions. In my experience as both an underwriter and an insurance broker for many years, I have difficulty imagining a different rational interpretation." Ex. A, ¶ 68. For this proposition,

Mr. Sagalow cites nothing in his report but testified as to the generalized "atmosphere" at the time of the policy drafting. Ex. D, at 90:20-92:1. Then, Mr. Sagalow notes that "[i]f Travelers intended its follow form excess policy to act contrary to the XL policy, Travelers had an obligation under industry custom and practice to advise the insured of that fact." Ex. A, ¶¶ 33(G), ¶¶ 72-73. Mr. Sagalow cites no authority for this assertion in his report (including the source of any obligation on Travelers, if any), and the only "obligation" he identified in his deposition was Travelers' duty to issue a non-follow form endorsement to the extent it departed from the primary policy. Because Travelers *did* follow form to XL (who interpreted the XL Policy's Securities Claim endorsement in the exact same manner as Travelers), Travelers had no obligation to issue a non-follow from endorsement, and thus this opinion is a red herring. *See* Ex. D, at 97:12-98:12.[5]

Further, Mr. Sagalow offers his opinions based on his experience as a D&O underwriter for AIG and its affiliate National Union (among other carriers), who allegedly first developed "Securities Claim" coverage in D&O liability policies with another insurer. *See* Ex. A, at ¶¶ 2-7, 43-49, 53-55 (describing AIG as a "leader" in the development of D&O policy terms). But Mr.

---

[5] Moreover, it is a longstanding principle of contract law that the Court must give meaning to the language of a contract, such that when parties add or otherwise change contract language, the Court will attempt to give it meaning. Put another way, the Court does not need an expert to opine on the canons of contract interpretation. *See* Ex. D, at 120:25-121:25 (agreeing that policy should be interpreted as a whole).

Mr. Sagalow also opines that a reasonable broker would interpret "amending the boilerplate definition of Securities Claim in 2016 by endorsement . . . [to mean that] a carrier would not be restricting that definition by endorsement." Ex. A, ¶ 69. But even Mr. Sagalow – who has written a monograph on the subject – concedes that an endorsement can expand, modify, *or restrict coverage*, so his assertion that this particular endorsement *necessarily expands* coverage is unsupported. *See* Excerpt from Ty R. Sagalow, *Directors and Officers Liability Insurance: A Guide for Directors* (Prof. Ed.), Section 10.05, at 12, attached as Exhibit E (defining endorsement as "a series of side agreements between insureds and the carrier reflecting points of negotiation and adjustments to the premium; this 'customized' section of the policy has enormous practical impact, *as it can either diminish or enhance the value of the policy to the company and insured officials*.") (emphasis added).

Sagalow was not testifying on behalf of AIG, National Union, or any of his other former employers, Ex. D, at 20:17-22, and in fact, his interpretation of the Securities Claim language at issue here is directly at odds with those carriers' interpretation of materially identical language in the *In re Verizon Coverage Appeals* litigation.  In *Verizon*, the carriers took the position that the Securities Claim language *did not* encompass underlying breach of fiduciary duty claims because such claims do not "regulate securities," just like Travelers did here – and the Delaware Supreme Court agreed with the carriers.  *See generally* Ex. F, *Opening Brief of Appellants Illinois Nat'l Ins. Co., Nat'l Union Fire Ins. Co. of Pittsburgh, PA, and U.S. Specialty Ins. Co.*, *In re Verizon Coverage Appeals*, Nos. 558,2018, 561,2018, 560,2018 (Del. Jan. 28, 2019) (public version).[6]

Second, Mr. Sagalow's opinions are based on a fundamentally flawed premise, which undermines all opinions that flow from it.  Mr. Sagalow states that "Securities Claim" coverage for entities was initially devised so that policyholders and insurers could avoid what he referred to as an "Allocation Problem."  Ex. A, at ¶ 34; *id.* ¶ 69 ("[T]he *entire point* of the definition of Securities Claim is to eliminate the problem of allocating defense cost and settlements as between individual directors and officers and corporations in any case involving securities where *both* parties are named.").  That problem originated at a time when only corporate directors and officers – and not the corporation itself – were insureds under standard D&O policies.  *See id.* at ¶ 35.  In certain underlying cases, such as securities actions brought under Rule 10(b)(5), both the insured directors and officers and the uninsured corporations were often named as defendants.  *See id.* ¶¶ 40-42.  As a result, disputes over the allocation of covered versus uncovered claims arose between carriers and policyholders.  *See id.* at ¶¶ 43-44.  According to Mr. Sagalow, insurers devised "Securities Claim" entity coverage to avoid such disputes.  *See*

---

[6] Illinois National and National Union are AIG affiliates.  *See* AIG, *Legal Notice*, https://www.aig.com/legal-notice (last accessed Mar. 4, 2020).

*generally id.* at ¶¶ 43-47.

But Mr. Sagalow takes this premise two steps too far. First, he ignores the fact that CAM – the company for whom Mr. Calamos and Koudounis served as directors – was not even a defendant in the underlying class action; thus the allocation issue he opines on did not exist.[7] Second, he opines that the original "[a]llocation [p]roblem" applied to breach of fiduciary duty claims brought against both the insured directors and officers, and the uninsured corporation. *See id.* at ¶ 42. But under long-settled principles of Delaware law – which both Messrs. Sagalow and Allingham acknowledge – the corporation *qua* corporation does not owe a fiduciary duty to its shareholders. *See* Ex. D, at 87:16-90:16; Excerpts from T. Allingham 2/28/2020 deposition at 77:23-78:5, attached as Exhibit G.[8] It follows that the corporation cannot be liable for breach of a fiduciary duty that does not exist, and thus it is implausible that any supposed "allocation problem" *could* exist for such claims. Mr. Sagalow does not, and cannot, explain this discrepancy, and thus a fundamental assumption on which all of his opinions are based is tainted.

In sum, the Sagalow Report fails to articulate a methodology demonstrating why and upon what basis he reached the conclusions he did. Instead, the trier of fact is left only with Mr. Sagalow's conclusion that "insurance industry custom and practice" support his interpretation of

---

[7] The only entity defendants in the Stockholder Class Action were Calamos Family Partners, Inc., Calamos Partners LLC and CPCM Acquisition, Inc. – all sued as controlling shareholders of CAM that pushed through the complained of merger. CAM was a respondent only in the Consolidated Appraisal Action, which did not include any directors and did not create any internal allocation issues.

[8] *See, e.g.*, *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996) ("Plaintiff has not cited a single case in which Delaware courts have held a corporation directly liable for breach of the fiduciary duty of disclosure. . . . This Court has stated: 'The only defendant is the corporate entity ... so there are no fiduciary duty claims.'"); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 322–23 (Del. Ch. 2013) ("As a corporate entity, Wayport did not owe fiduciary duties to its stockholders."); *In re Dataproducts Corp. Shareholders Litig.*, 1991 WL 165301, at *6 (Del. Ch. Aug. 22, 1991) ("The claims stated against Dataproducts are clearly for breach of fiduciary duty. However, the plaintiffs concede that a corporation *qua* corporate entity is not a fiduciary of, and thus cannot owe a fiduciary duty to, its shareholders.").

the Securities Claim language in the Travelers Policy.  This is exactly the kind of conclusory, non-scientific, and unreliable speculation that the courts should prohibit under *Daubert* and Rule 702.  *See Likes Law Office*, 44 N.E.3d at 1291 (trial court abused its discretion by admitting Mr. Sagalow's opinions on insurance industry custom and practice and observing that "[a] mere generalized statement of 'based on the custom and practice of the professional liability insurance and underwriting industry' without any further clarification does not lift these paragraphs from the impermissible realm of legal conclusion into valid expert opinion.").

### 3. Mr. Sagalow's Opinions Do Not Fit the Facts of this Case and Are Not Helpful to the Trier of Fact.

The same lack of reliable methodology also demonstrates that Mr. Sagalow's opinions fail to serve a proper fit to this action and are not helpful to the trier of fact.  Indeed, the Sagalow Report reveals only the development and history of various insurance carriers' use of "Securities Claim" endorsements – individualized contractual agreements – and Mr. Sagalow's conclusory reliance on unspecified and unsupported industry customs and practices.  Even Mr. Sagalow agreed that the interpretation of "Securities Claim" language in the Travelers Policy does not turn on the Securities Claim endorsements issued by other carriers in other policies.  *See* Ex. D, at 105:10-106:3.

As is particularly relevant, Mr. Sagalow did not discuss the meaning of the Travelers or XL Policies at issue in this litigation – including the definition of "Securities Claim" – with anyone at Travelers or XL, the primary carrier, and lacks any understanding of their actual underwriting intent with respect to the policies at issue in this dispute.  *See generally* Ex. D, at 93:7-97:11; *see also* Ex. A, at ¶ 67.[9]  He also admitted that he had no understanding of the actual intent of CAM or AON (CAM's insurance broker for those policies) with respect to underwriting

---

[9] Such underwriting intent is irrelevant in any event given that the XL Policy is unambiguous.

issues, and could not identify any departures from custom or practice by the underwriters of the policies at issue, and only speculated that the claims handlers departed from custom and practice. *See* Ex. D, at 93:12-13, 95:7-96:25, 101:3-5. Without any basis for understanding what the parties actually intended, Mr. Sagalow's opinions on other policies, other policy forms, and other carriers' practices cannot be extrapolated to the policies at issue here. These opinions simply do not fit the facts, and thus cannot be helpful to the trier of fact. *See In re Paoli R.R.*, 35 F.3d at 742-43 ("[A]dmissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case' . . . [E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case.*").

### C. **Thomas J. Allingham's Opinion and Testimony Fail to Satisfy *Daubert***

Mr. Allingham's opinion is offered for the stated purpose of responding to Travelers' expert, Professor Lawrence Hamermesh, as to whether the "exposure to liability [in the underlying class action] would have been substantially or even overwhelmingly weighted more toward John P. Calamos, Sr. and his affiliates (the Control Group Defendants), as the controlling stockholder of [CAM] and to John Koudounis, as a self-interested participant in the Merger buyout group, than to either John P. Calamos, Sr. or John Koudounis in their capacity as directors [of CAM]." Ex. C, at ¶ 1.

Reduced to their core, Mr. Allingham's opinions are that: (1) all cases are "fact specific," such that there is no general understanding of practitioners relating to how allocation would apply here; (2) all claims in the underlying action would have been measured under the "entire fairness" standard; and (3) certain allegations in the underlying class action complaint could only have been lodged against the director and officer defendants. *Id.* ¶ 2.[10]

---

[10] Mr. Allingham also cites the "remarkably similar" allegations in Counts I and II of the

- 11 -

### 1. Mr. Allingham's Opinions Are Irrelevant and Constitute Inadmissible Legal Conclusions.

Mr. Allingham's opinions on allocation are irrelevant legal conclusions. Here, the Travelers Policy specifically prescribes a contractual standard for allocation. Section V(D) & (E) of the XL Policy establishes that the parties bargained for the "relative exposure" rule of allocation. Applying this contract term to the facts is a question for the trier of fact, who will be reviewing the same documents and testimony in this case in connection with the policy language – and the record the trier of fact will likely consider will be more developed than the "facts" considered by Mr. Allingham, *see infra*. There is no need for expert testimony on interpreting or applying the policy language, and thus Mr. Allingham's opinions are inadmissible legal opinion. *See Berckeley Inv. Group*, 455 F.3d at 217.

### 2. Mr. Allingham's Opinions are Not Reliable.

Mr. Allingham's conclusions are inherently unscientific and speculative. There is no discernible methodology to his report, rather, it appears that Mr. Allingham based his opinions entirely on his experience as a longtime practitioner of Delaware law (as a self-described "leading practitioner" of that group), and to show that at least one practitioner of Delaware corporate law disagrees with Professor Hamermesh's opinions. Ex. C, at ¶¶ 3-7. But Mr. Allingham cites no authority for his opinions, and thus there is no methodology on which his opinions could be tested. Rather, apart from a handful of references to the underlying class action complaint, the entirety of Mr. Allingham's "Opinions and Analysis" section fails to cite any applicable principle or authority justifying his conclusions. *See* Ex. C, at ¶¶ 10-25.

As to the allegations in the class action complaint, Mr. Allingham acknowledges that because the underlying case settled prior to a final adjudication, the class plaintiffs' allegations

---

Class Action Complaint, yet each of those counts incorporates all of the preceding factual allegations, so this opinion is of virtually no substance.

have not been proven and that "the complete facts and circumstances that would inform an allocation of liability and damages in the Class Action are not perfectly knowable." *Id.* ¶ 14. Accordingly, his opinions are admittedly not based on a developed record. Further, he cites only a few allegations in the class action complaint for the proposition that such actions could only be taken by directors or officers of the company, as opposed to the Control Group, Ex. C at ¶ 23 (citing paragraphs 47-49, 67, 92-93 of the class action complaint), but ignores the overwhelming weight of allegations in the class action complaint alleging Mr. Calamos' (and the Control Group's) improper use of their dominance and control over CAM, and the Control Group's unfair bargaining with the Special Committee tasked with evaluating the buyout. *See, e.g.*, Verified Stockholder Action Complaint, *Schechter, et al. v. Calamos, et al.,* 2017-0356-JTL (Del. Ch.), at ¶¶ 23-31, 36-46, 59-83, attached as Exhibit H.

Nor does Mr. Allingham's report actually rebut aspects of Professor Hamermesh's opinions. For example, Mr. Allingham chides Professor Hamermesh's report as "speak[ing] exclusively in terms of characteristics of going private transaction challenges generally," citing Professor Hamermesh's conclusion that "controlling stockholder and members of the controller's buyout group . . . benefit to the extent that the freeze-out price paid to minority shareholders is too low." Ex. C, at ¶ 16. But Mr. Allingham fails to respond to the substantive point – either generally or specifically as to this case – of whether a controlling stockholder is the one who stands to benefit from a lower buyout price in a freeze-out merger.

Further, it is patently obvious that Mr. Allingham's opinions suffer from abstraction and are based on insufficient facts or data. *See* Fed. R. Evid. 702. Mr. Allingham relied only on a handful of documents in the underlying action, and cites only the class action complaint in his report. *See* Ex. C, at Appendix B. Even where Mr. Allingham's report identifies "some facts and circumstances [that] can be observed and analyzed," Mr. Allingham fails to identify what

"facts and circumstances" – if any – support his rebuttal to Professor Hamermesh. *Id.* ¶ 14. Even though Mr. Allingham opines that allocation in any case depends on its facts and circumstances, he improperly bases his opinions on an incomplete review of the record in this case.

Indeed, Mr. Allingham does not offer any practical application of allocation that could bridge his generalized analysis with the actual facts, thereby assisting the trier of fact in its allocation determination. In his deposition – and unlike Professor Hamermesh – Mr. Allingham could not (or would not) offer any estimate of the allocation between the Control Group and the individual director and officer defendants. Ex. G, at 64:22-65:5. Nor would he opine on the likelihood that defendants would be found liable for breaching their fiduciary duties had the class action proceeded to trial. *See id.* at 65:6-66:5. At his deposition, Professor Hamermesh offered that – if pressed – he would testify that the Control Group would likely be responsible for 60-100% of damages if the class action had proceeded to trial and the defendants were found liable. *See* excerpt from L. Hamermesh 2/24/2020 deposition at 163:7-23, attached as Exhibit I. Unlike Mr. Allingham, Mr. Hamermesh's opinions and testimony are grounded in an application of his opinions to the circumstances at hand, rather than a vague and speculative set of concepts that lack any rooting in a scientific method or application to *this* dispute.

In sum, Mr. Allingham's opinions are not based on any discernible methodology or sufficient facts or data, and should therefore be excluded.

> ### 3. Mr. Allingham's Opinions Lack the Appropriate Fit, Are Not Helpful to the Trier of Fact, and Are Not Relevant.

As discussed above, Mr. Allingham's opinions are based on the pleadings in the underlying class action and not on any "facts" as developed in that case. The trier of fact will need to apply the *facts* of this case – not mere allegations – to determine what the "relative legal and financial exposure" of the underlying defendants would be, as is required by the Travelers

Policy.  *See* excerpt from XL Policy § V(D) & (E), attached as Exhibit J.  Accordingly, his opinion on allocation – which, as he states, is necessarily fact-specific – fails to fit the actual facts and thus fails to satisfy Rule 702 and *Daubert*.

Further, Mr. Allingham's opinion in paragraph 20 of his report is not helpful and has the potential to confuse the jury.  Mr. Allingham opines that it is likely that both counts of the class action complaint would be reviewed under the entire fairness standard.  Ex. C, at ¶ 20.  But this opinion does nothing to inform the allocation of exposure to liability as between the Control Group or the director and officer defendants.  As Mr. Allingham acknowledged at his deposition, the standard of review applicable to the transaction does not necessarily mean that all defendants would be liable – that is, face actual exposure – in such circumstances.  *See* Ex. G, at 45:20-46:9.  Entire fairness is merely the standard of review by which the transaction will be judged; not a measure of liability *per se*.

### III.   CONCLUSION

For all of the foregoing reasons, Travelers respectfully requests that the Court grant its motion and enter an order excluding Mr. Sagalow and Mr. Allingham from testifying at trial.

ECKERT SEAMANS CHERIN & MELLOTT, LLC

Dated:  March 4, 2020

By:  */s/ Francis G. X. Pileggi*
Francis G.X. Pileggi (Del. Bar No. 2624)
222 Delaware Avenue, 7th Floor
Wilmington, DE 19801
(302) 655-3667
fpileggi@eckertseamans.com

OF COUNSEL:

Ronald P. Schiller *(pro hac vice)*
Daniel J. Layden *(pro hac vice)*
HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
One Logan Square, 27th Floor
Philadelphia, PA 19103

                (215) 568-6200
                rschiller@hangley.com
                dlayden@hangley.com

*Counsel for Defendant Travelers Casualty and Surety Company of America*