# EXHIBIT A



**EXPERT WITNESS REPORT OF TY R. SAGALOW**

CALAMOS ASSET MANAGEMENT INC,

-against-

TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA

January 10, 2020

I

## WITNESS QUALIFICATIONS

1.  I have been an insurance executive for over 36 years.  My CV, which details my qualifications, is attached as Appendix B.

2.  From 1983 to early 2009, I held various senior positions in AIG including Chief Underwriting Officer and General Counsel of National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), Chief Operating Officer for AIG eBusiness Risk Solutions, a cyber-insurance company, and President of AIG Product Development (General Insurance, Global).

3.  From 1987 to December 1999, I was with National Union first as Deputy General Counsel and ultimately as General Counsel and Chief Underwriting Officer. As a Chief Underwriting Officer, I was responsible for major underwriting decisions for one of the world's largest liability insurance carriers.  I was best known within National Union for Directors and Officers Liability insurance.  This included underwriting decisions and teaching underwriters respecting D&O insurance including but not limited to material aspects of the insurance application and underwriting submissions. In this role, I was responsible for making the fundamental underwriting intent decisions behind the AIG/National Union D&O forms during this period of time including the ones we launched in 1988, 1995, 1996, 1998 and, for the most part, 2000.

4.  As Assistant General Counsel and then General Counsel, I personally wrote, or led a team that wrote, all the insurance policies that National Union produced from 1988 to 2000.  Specifically, in this role, I led the team who wrote National Union's D&O policies in 1988, 1995, 1996 (Securities Plus), 1998 and, up until December 1999, the 2/2000 form. In these capacities I supervised the drafting of various liability insurance applications and was charged with the creation and implementation of underwriting rules geared toward the understanding of risk.  These policies include both primary and excess liability insurance.

5.  As Chief Underwriting Officer of National Union, I also participated in major claims meetings. These meetings occurred several times a year.  It also was commonplace for me and the head of claims to discuss coverage positions on potential claims submitted

1

to the company.  It would not be uncommon for this type of conversation to occur at least once a week.

6.    As a matter of process, both senior underwriters and senior claims personnel worked hand in hand in the creation of new insurance policies. This occurred for every major new policy.

7.    Immediately following my time at AIG until 2012, I was at Zurich North America and The Tower Group, initially in each job as the company's Chief Innovation Officer where I led teams that developed and drafted various insurance policies and products, among other activities.  In that role, I was the chief drafter of Zurich's D&O Select insurance policy.

8.    Since February 2012, I have been Founder & CEO of Innovation Insurance Group, LLC, a consulting firm to the insurance industry, with offices in Short Hill, New Jersey.

9.    Since 2012, I have been a licensed insurance broker.  Today, I am a licensed P&C and surplus line insurance broker in all 50 states and the District of Columbia.

10.   Since 2013, part of my consulting practice has included serving as an expert witness in insurance coverage, underwriting, claims and insurance brokerage matters, advice and counsel to both policyholders, insurers and insurance brokers for various types of insurance products.  For example, I have personally reviewed and been consulted on many policy language changes in liability policies, both on a primary and excess basis.

11.   As an expert witness, I have been so retained over 84 times.  I have testified as an insurance expert approximately 31 times, 5 times at trial or arbitration.  I have been affirmatively held to be an insurance expert under Federal Rules of Civil Procedure Rule 702 by the United States District Court for the Southern District of California and testified at trial as an insurance expert in that matter.  Details of these engagements are included in my CV.

12.   I also regularly advise insurance companies, insurance brokers and policyholders on issues of word choice, grammar, sentence construction, clarity and placement of provisions in the policy, to make the insurance policy readable and understandable to a purchaser and how those wordings impact the rights and obligations of the parties as well as the insurance broker.  These consultations typically can include an analysis of underwriting and claims decisions.

2

13.  I have taught seminars on proper claims-handling process for the Claims Litigation Management Alliance's "Claims College". I have taught in the following subject areas, which have included teaching the approaches to interpreting policy language including claims handling issues. Examples include:

   - The Proper Role of the Claims Examiner,
   - Stakeholders to Consider in the Claims Process, and
   - Best practices in communication and coordination in Claims.

14.  I graduated *summa cum laude* from Long Island University, *cum laude* from Georgetown University Law Center, and I have an L.L.M. from New York University Law School. I am also a licensed insurance broker.

15.  I am the author and/or co-author of several works in the field of D&O insurance and new product development. Details of these publications are included in my CV.

16.  I have spoken before numerous forums in my lengthy career. Details are included in my CV and on my website, innovationinsurancegroup.com.

## II

## COMPENSATION

17.  I am being compensated at a rate of $795 per hour. Days at trial and depositions have a minimum of eight hours. My compensation is not dependent upon my findings or the outcome in this matter.

## III

## DATA CONSIDERED

18.  I reviewed and considered the documentation listed in Appendix A of this report in reaching my conclusions.

19.  In addition to the above documents, in reaching the opinions expressed herein, I relied upon my education and my knowledge of insurance industry custom and practice as it relates to the subjects discussed, gained from my thirty-plus years of experience as a chief underwriting officer, general counsel and chief innovation officer of large insurance companies. Further, my opinions are also based on my extensive experience in over 85 cases representing policyholders, insurance carriers and third parties in

insurance disputes and other related insurance matters.  Some of my opinions may be the result of personal experiences, and others the result of general industry knowledge gathered over my decades of operating in the insurance industry.  My opinions in this matter are a result of the knowledge, skill, experience, training, and education I've received from the insurance industry over the course of three decades in specialized matters.

20.   To the extent indicated in the list of materials or otherwise in this report, I may have also relied upon materials I have written or speeches I have given on the subject matter of this dispute.

21.   I am aware that discovery is on-going and that additional documents may be provided to me to review in the future.  I reserve my right to amend this report upon review of such additional information and otherwise.

## IV

### SUMMARY OF FACTS

22.   On or about December 19, 2016, Calamos Asset Management, Inc. ("CAM") announced that it had reached an agreement in principle to be taken private through a transaction by which an affiliated entity would commence a tender offer to acquire all of the outstanding shares of CAM's Class A common stock for $8.25 per share (the "Merger").

23.   After announcement of the Merger, and beginning on or about January 25, 2017, certain shareholders of CAM brought lawsuits in the Court of Chancery of the State of Delaware against CAM, certain if its affiliates and certain of their directors and officers, alleging breaches of fiduciary duty in connection with the Merger. (the "Stockholder Action" or "Underlying Proceeding").

24.   The Underlying Proceedings were initiated by stockholders of CAM and involved the purchase or sale of, or offer to purchase or sell, securities of CAM.

25.   CAM purchased from its primary D&O liability insurer, XL Specialty Insurance Company ("XL"), a Management Liability and Company Reimbursement Insurance

4

Policy, No. ELU146965-16, for the policy period October 27, 2016 to October 27, 2017 (the "XL Primary Policy").

26.    CAM purchased from its first-layer excess D&O insurer, Continental Casualty Company ("CNA"), a first-layer excess D&O liability policy, No. 268154065, for the policy period October 27, 2016 to October 27, 2017 providing $10 million excess of XL's $10 million limit of liability (the "CNA Excess Policy") and from Travelers a second-layer excess D&O liability policy, No. 106619456, to CAM providing another $10 million excess of $20 million aggregate limit for the policy period October 27, 2016 to October 27, 2017 (the "Travelers Excess Policy").

27.    Both the "CNA Excess Policy" and the "Travelers Excess Policy" were "follow form", meaning that the policies followed all the terms and conditions of the XL primary policy, including the definition of Securities Claim.

28.    CAM submitted the Stockholder Action to its insurers for coverage on a timely basis.

29.    Common industry custom and practice for excess follow form carriers is to take a "review and adopt" position as to respects the coverage position of the primary carrier.

30.    By letters dated August 3, 2018 and September 7, 2018, Travelers denied coverage on several grounds.

**V**

**SUMMARY OF CONCLUSIONS**

31.    I have been asked by counsel for Calamos Asset Management, Inc. to provide an expert opinion on the custom and practice of the insurance industry with respect to the definition of Securities Claim in a directors and officers insurance policy generally as well as its specific application to claims alleging common law breach of fiduciary duty in the context of a securities transaction.

32.    I have also been asked to provide an expert opinion on the custom and practice of the insurance industry with respect to the significance of the absence of a specific "bump-up" exclusion in a directors and officers insurance policy.

33.    For the reasons set forth in this report, it is my expert opinion to a reasonable degree of professional certainty that under industry custom and practice:

5

A. In around 1985, the insurance industry began to confront the "Allocation Problem" in claims involving securities. The "Allocation Problem" concerned the coverage issue of allocating "joint loss" between insured directors and officers and uninsured corporation to the insured D&Os (and thus the insurance policy) in all the securities claims that named both. That allocation exercise was difficult and contentious.

B. Securities claims that named both individual directors and officers and the corporate entity, thus presenting the "Allocation Problem", included both statutory claims as well as common law breach of fiduciary duty claims.

C. In 1995, AIG created a new term, "Securities Claim", and a new concept, "Entity Coverage", to solve the "Allocation Problem." The solution to the "Allocation Problem" was to eliminate it by providing coverage for both individual directors and officers and the corporation in *all* the common securities cases which name both individual directors and officers and the corporation, including cases involving common law claims for breach of fiduciary duty, i.e. "Securities Claims".

D. A common definition of "Securities Claim", began by AIG in 1996 and later adopted by other insurers, used the phrase "whether statutory or common law". The purpose of this phrase was to clarify or emphasize that cases involving common law claims for breach of fiduciary duty were Securities Claims for which Entity Coverage was provided. The significance of the "whether statutory or common law" phrase in a "Securities Claim" definition was, and is, well known within the insurance industry, its brokers and risk managers.

E. Endorsement #19 of the XL Policy issued to CAM is an example of a "Securities Claim" definition that uses the "whether statutory or common law" phrase introduced by AIG in 1996 to ensure that cases involving common law claims for breach of fiduciary duty are "Securities Claims" for which Entity Coverage is provided.

F. As a matter of insurance industry custom and practice: (1) XL's use of Endorsement #19 means that XL intended that "Securities Claims" would include violations of common law, i.e. breaches of fiduciary duty, as respects securities

6

transactions; and (2) to interpret and apply a definition of "Securities Claim", especially one that includes the "whether statutory or common law" phrase, in a case involving securities which names both individual directors and officers and the corporation, such as cases involving allegations of breach of fiduciary duty, in a manner which *creates* allocation issues rather than eliminates them is incorrect.

G.   As an excess follow form carrier, Travelers has agreed to provide coverage to CAM pursuant to the same terms and conditions as XL.  If Travelers intended its follow form excess policy to act contrary to the XL policy, Travelers had an obligation under industry custom and practice to advise the insured of that fact.

H.   For 25 years the D&O industry has been aware of, and concerned about, how much coverage to provide, and when coverage should be provided, for so-called "bump-ups" in the price or consideration paid, or allegedly paid, in a settlement of a M&A post transaction claims.

I.   As a result of these concerns, various versions of a "bump-up exclusion" have been created by the industry and regularly appear in the boilerplate of D&O policies since 1995.

J.   Because the issue of bump-ups has been so well known for so long and the existence of bump-up exclusions of various varieties have been so well ingrained in the policies in the D&O market for decades, it is the reasonable expectation of any insured as well any broker that any D&O carrier wishing to take a position as to whether to exclude a bump-up and, if so, under what circumstances, must do so by adopting one of the bump-up exclusions already in the marketplace or creating a new one of its own should it wish to do so.

K.   A policy, such as XL and Traveler's that does not contain an expressed bump-up exclusion does not exclude the amount of any increase in consideration or "bump-up" in price in a securities settlement on the theory that such amount is inherently not "loss" under a D&O policy in a claim which alleges that such loss is damages arising out of an otherwise covered Wrongful Act.

**VI**

**DETAILED OPINIONS AND DISCUSSION**

ISSUE 1.    SECURITIES CLAIM

**History of the Definition of "Securities Claim"**

34.    To understand the definition of Securities Claim it is necessary to understand the
problem the definition was created to solve.    It was called the "Allocation Problem."
More specifically, the problem of allocating loss between the individual directors and
officers and the corporation in a claim brought by securities holders or involving
securities.

35.    When directors and officers insurance was first created, the policy covered, logically
enough, only directors and officers.  Most importantly, the policy did not cover the
corporate entity itself[1].  This was not a problem because up until the mid 1980's D&O
claims were relatively infrequent and not very expensive.

36.    However, all that changed about 35 years ago, around 1985, with two related events:
(1) the emergence of the professional securities plaintiffs' bar led by William Lerach
and (2) the Delaware fiduciary duty decision of Smith v. Van Gorkom.

37.    The first of these events created a practical application of 10(b)(5) litigation against
corporate directors and officers, a statutory securities claim, and the second created an
enhanced fiduciary duty liability toward securities holders, a common law securities
claim.

38.    From approximately 1985 to 1993, both carriers and corporate policyholders struggled
with how to handle the new environment.  D&O insurance pricing went sharply up.

39.    From the carrier's side, the frequency and severity of securities claims, both 10(b)(5)
and common law, was getting out of hand and no one knew what the right price for the
insurance should be.  This, in turn, caused a policy coverage gap inherent in the policy
form to be suddenly extremely problematic to both sides.

---

[1] This is with respect to the type of policy purchased by publicly traded companies.  There is a different history
respecting privately held and non-profit companies buying D&O insurance obviously not relevant in this case.

40. While both the carrier and the policyholder were trying to figure out how to manage and settle these new securities claims, they were also trying to figure out how to spilt up the cost of the claims between the covered D&Os (and therefore the carrier) and the uncovered corporation (and therefore the policyholder).

41. At the beginning, by silent agreement, the allocation was heavily toward the uncovered corporation with corporate general counsels preferring to "save" the policy limits for a rainy day and the insurance carriers being more than happy to allocate joint defense costs and settlements to the uncovered corporation and away from themselves.

42. By 1993, corporate general counsels were no longer willing to give D&O carriers favorable allocations in securities claims, whether of the 10(b)(5) or common law breach of fiduciary duty variety, which named both the individual directors and officers and the corporation (something which almost always happened).  Carriers believing that they were not charging sufficient premium for "pro-insured" allocations where the vast majority of joint incurred loss would be allocated to the policy refused to agree to provide high allocations to the covered individual directors and officers.  Litigation between D&O carriers and their insureds quickly commenced.

43. As allocation litigation started making its way through the courts, AIG led the way to try to reach a business solution beginning with  "pre-set allocation" endorsements in 1993.  As both General Counsel and Chief Underwriting Officer of National Union, the task fell to me to draft the endorsements and try to sell it to the marketplace.  Initially AIG was only somewhat successful.   AIG's initial endorsement required that the claim was made and continuously maintained against both the individual D&Os and the corporation, allocated and offered various allocation percentages between the covered D&Os and yet still uncovered corporation at what, in retrospect, were high additional premiums, as much as 40%.  However, AIG sold it as having the benefit of certainty at a time of uncertainty and got more than a number of insureds to buy into the concept.

44. But, by 1995, AIG knew that its "pre-set allocation" endorsement was destined to be a temporary fix.  We needed a more permanent solution.   Worse, a number of allocation cases were making their way through the courts all dealing with how to allocate defense costs and/or settlements between the individual directors and officers and the corporation in securities cases, including cases involving common law claims for

breach of fiduciary duty.  By and large, the cases were going in favor of the insured, resulting in large allocations to covered individual directors and officers[2].  Something had to done to solve the allocation problem before it was solved for the carriers.  I was tasked to find the solution for AIG.

45.    In May of 1995, National Union announced a new type of D&O insurance called the "5/95" form for the month and year the form was launched into the market.  The policy created a new term, "Securities Claim", and a new concept, "Entity Coverage", providing, for the first time in an "off the shelf" D&O insurance policy, the granting of full insured status corporations for "Securities Claims".  AIG defined a "Securities Claim" as follows:

> "Securities Claim" means a Claim made against an Insured which alleges a violation of the Securities Act of 1933 or the Securities Exchange Act of 1934, rules and regulations promulgated thereunder, the securities laws of any state, or any foreign jurisdiction, and which alleges a Wrongful Act in connection with the claimant's purchase or sale of, or the offer to purchase or sell to the claimant, any securities of the Company, whether on the open market or arising from a public or private offering of securities by the Company[3].

46.    While AIG was praised for trying to solve the allocation problem, this definition was immediately criticized by the brokerage community as being too narrow.  Was an SEC civil lawsuit or criminal proceedings a "Securities Claim"?  How about common law breach of fiduciary duty cases?  Did these types of claims fall within the definition?

47.    AIG was trying to *solve* the allocation problem.  The reference to '33 Act and '34 Act violations in the AIG definition did not restrict themselves as to who the plaintiff was and the phrase "securities laws of any state" in the definition included state blue sky laws as well as state common law breach of fiduciary duty claims, AIG replied.  The word "rule" in this context includes rules made by the courts not just the legislation or regulatory bodies. After all, how can AIG come up with a definitive solution to the

---

[2] *See e.g.*, *Northstrom, Inc. v Chubb & Son, Inc. (54 F3d 1424, 9th Cir. 1995); Safeway, Inc. v National Union Fire Insurance Company of Pittsburgh, Pa.* 64 F. 3d 1282 (9th Cir. 1995); *Harbor Ins. Co v. Continental Bank Corp.*, 922 F2d 357,368 (7th Cir, 1990)

[3] American International Companies, "Directors, Officers and Corporate Liability Insurance Policy", Form 62335 (5/95), definition (k).

allocation problem between individual directors and officers and the corporation without a definition of Securities Claim that encompassed *all* the common securities cases which name both individual directors and officers and the corporation, including cases involving common law claims for breach of fiduciary duty?

48.   Brokers, however, prefer words, especially when the market is coming out with something new.  So, the following year, in 1996, AIG created the "Securities Plus" mandatory endorsement with a "new and improved" definition of "Securities Claim:[4]"

> "Securities Claim" means a Claim (including a civil lawsuit or criminal proceeding brought by the Securities & Exchange Commission) made against an Insured and brought anywhere in the world alleging a violation of any law, regulation or rule, *whether statutory or common law*, which is:
>
> (1) brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the purpose or sale, or offer or solicitation of an offer to purchase or sale, any securities of the Company, or
>
> (2) brought by a securities holder of the Company, whether directly, by class action or derivatively on the behalf of the Company, or otherwise, alleging any Wrongful Act of an Insured;
>
> (emphasis added)

49.   It was understood by the insurance industry that this definition of Securities Claim includes common law violations of fiduciary duty even if there had been questions about the scope of the prior definition.  The next time AIG rewrote its basic D&O form, in 1998, AIG largely left the definition of "Securities Claim" alone making only minor changes.  AIG also kept the reference to "whether statutory or common law":

> "Securities Claim" means a Claim (including a civil lawsuit or criminal proceeding brought by any governmental body) made against an Insured and brought anywhere in the world alleging a violation of any law, regulation or rule, whether statutory or common law, which is:
>
> (1) brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the purchase or sale or offer or solicitation of an offer to purchase or sell, any securities of the Company, or

---

[4] AIG, "Securities Plus" endorsement, Form 65711 (6/96), paragraph 3, definition (k)

(2) in the form of a securities holder derivative claim brought on the behalf of the Company, or

(3) brought by a securities holder of the Company, with respect to such securities holder's interest in such securities of the Company, whether directly or by class action[5].

**Industry Reception to Entity Coverage and the Definition of Securities Claim**

50.     The introduction of Entity Coverage and the accompanying definition of Securities Claim to include *all* the common securities cases which name both individual directors and officers and the corporation, including cases involving common law claims for breach of fiduciary duty, was a turning point in the D&O insurance industry.  It prompted countless seminars at PLUS, RIMS and other insurance conferences.  As a consequence of these seminars, and similar industry discussions, it was understood by the insurance industry that the definition of Securities Claim, especially one that includes the "whether statutory or common law" phrase, included *all* the common securities cases which name both individual directors and officers and the corporation, including cases involving common law claims for breach of fiduciary duty.

51.     Of course, there was also much academic work done on the subject, especially at the time[6].

52.     In 2011, John Olson from Gibson, Dunn & Crutcher and  Josiah Hatch, now a professor of International Studies at the University of Denver, asked me to collaborate on a new book they were writing for West Publishing on "Directors and Officer Liability, Indemnification and Insurance."  By the time this book was published in 2011, I described as "state of the art" the AIG definition of Securities Claim that included the "whether statutory or common law" phrase, which ensures that the definition captures *all* the common securities cases which name both individual directors and officers and

---

[5] American International Companies, "Directors, Officers and Corporate Liability Insurance Policy", D&O Gold[sm], Form 70320 (4/98), definition (o). Later, I would refer to this definition in a chapter I wrote in the Olson Hatch publication of "Director & Officer Liability: Indemnification and Insurance" (2011-2012 Edition), West Publishing, as the "state of the art" definition of "Securities Claim" (§1242 at page 1062).

[6] *See, e.g.*, Directors and Officers Liability Insurance: A Guide for Directors: A Professional Edition" by Ty Sagalow (NACD, 1999), 10:09

the corporation, including cases involving common law claims for breach of fiduciary duty.

**Frequent Industry Adoption of the "whether statutory or common law" phrase**

53.     AIG has long been considered a leader in the D&O field, often in the first or second market leading position with respects to D&O insurance for publicly traded companies.

54.     The industry has frequently looked at AIG for policy language and new coverage inventions.  This was never more true than in the case of Entity Coverage.

55.     Therefore, it should not be surprising that even looking at the market today, some carriers continue to adopt phrases from AIG policies which they believe are consistent with underwriting intent.  One such example is the use of the phrase "whether statutory or common law" in the definition of Securities Claim, which makes clear that the definition captures *all* the common securities cases which name both individual directors and officers and the corporation, including cases involving common law claims for breach of fiduciary duty.

56.     For example, in 2009, Zurich rewrote its D&O policy and included the following definition of Securities Claim:

> **Securities Claim** means any **Claim** alleging *a violation of any statutory or common law* which in whole or in part is: (i) brought by one or more securities holders of the **Company**, in their capacity as such, or (ii) based upon, arising out of or attributable to the purchase or sale of, or offer or solicitation of an offer to purchase or sell, any securities issued by the **Company**, whether such purchase, sale, offer or solicitation involves a transaction with the **Company** or occurs in the open market (including without limitation any such **Claim** brought by the Securities and Exchange Commission or any other claimant)[7]. (emphasis added)

---

[7] Zurich, "D&O Select", (2009), definition of Securities Claim.  In full transparency, I was Chief Innovation Officer of Zurich America at the time and played a role in drafting this policy.

57.     The technique is even copied by some of the lesser known D&O carriers such as in the case of Plaza Insurance Company:

"Securities Claim" means any Claim for a Wrongful Act made against an Insured alleging a violation of any law, regulation or rule, *whether statutory or common law*, which is:

1)  brought by any person or entity alleging, arising out of, based upon or attributable to, in part or in whole, the: a) purchase or sale of any securities issued by the Company, or b) offer or solicitation of an offer to purchase or sell, any securities issued by the Company, or

2)  brought by a security holder of the Company in their capacity as such, whether directly, by class action, or derivatively on behalf of the Company;

provided Securities Claim does not include any investigation of or administrative or regulatory proceeding against the Company[8].

(emphasis added)

58.     Yet another method is to create a definition of Securities Claim which lists the various types of causes of action or legal foundations making sure to include a paragraph making reference to breach of duty claims. As explained below, this was the approach used by XL in 1999 in its boilerplate definition of Securities Claim, the base policy used for Calamos.

59.     Alternatively, a carrier could use a technique similar to the one AIG used in its 1998 D&O Gold definition, incorporating the phrase "common or statutory law" as in the examples I also cited above.  As explained below, this was the approach used by XL in endorsement #19 to the Calamos policy adopted by Travelers in their follow form excess policy.

**Definition of "Securities Claim" in Policies Sold to CAM**

---

[8] **Plaza. Insurance Company (PC 12005. (10/11) (wholly owned sub of State Automobile Insurance Co**

14

60. With the above history as background, understanding the definition of "Securities Claim" provided in the XL policy given to Calamos (and followed by Travelers) becomes straightforward from a point of view of industry custom, practice and standards.

61. The operable endorsement is endorsement #19. However, to fully understand endorsement #19 we must first look at the drafting history of the policy, at least in terms of the definition of Securities Claim.

62. Page 3 of the boilerplate form contains the pre-endorsement definition of Securities Claim which represents the common or core approach taken by XL in 1999[9] when the form was written:

> (Q) "Securities Claim" means a **Claim** made against an Insured for:
>
> (1) any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934 as amended, any similar federal or state statute or any rules or regulations promulgated thereunder; or
>
> (2) any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, offer to purchase or sell any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

63. Viewed through the lenses of history, the XL form, written just four years after AIG's old 1995 AIG policy, is a version of AIG's 1995 definition. Paragraph (1) is the first part of the AIG definition and refers to statutory securities laws ('33 act, '34 Act etc.) while paragraph (2) is AIG's part of "securities law of any state". XL did a better job of making sure breach of fiduciary duty claims were part of the definition than did AIG by specifically referencing "breach of duty" in subparagraph (2).

---

[9] XL's format for form numbers includes the month and year of the form as the last four digits of the form.

64.     It is my expert opinion that claims that arise from the sale of the insured's class A common stock in a "going private" transaction and allege breach of fiduciary duty against the directors and officers of the insured company relating thereto, would clearly fall under subparagraph (2) of this definition.

65.     Endorsement #19 deletes the above definition and replaces it with the following:

"(Q)     'Securities Claim' means a Claim, other than an administrative or regulatory proceeding against or investigation of a Company, made against any Insured for:

(1)     any actual or alleged violation of any federal, state, local regulation, statute or rule *(whether statutory or common law)* regulating securities, including but not limited to the purchase or sale of, or offer to purchase or sell, securities which is:

(a)     brought by any person or entity based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the purchase or sale of or offer to purchase or sell, securities of the Company; or

(b)     brought by a security holder of the Company with respect to such security holder's interest in securities of such Company; or

(2)     brought derivatively on behalf of the Company by a security holder of such Company.

Notwithstanding the foregoing, the term 'Securities Claim' shall include an administrative or regulatory proceeding against, or investigation of, a Company, but only if and only during the time that such proceeding or investigation is also commenced and continuously maintained against an Insured Person."

(Emphasis added)

66.     In creating this endorsement, XL virtually copied the then-current AIG definition of Securities Claim with, at least for the purposes of this case, one obvious difference:

*They added back AIG's 1998 "(whether statutory or common law)" reference.*  The month and year of the endorsement form shows that the endorsement was first created by XL in June of 2007.  The then-current AIG form was the 2/2000 policy. So, like XL viewed AIG's 5/95 definition of Securities Claim when it created a similar  version of the AIG definition of Securities Claim when they wrote their boilerplate language in 1999, so too XL looked at AIG's 2/2000 form in 2007 when they created their Securities Claim endorsement.

67.   While I, of course, do not have personal knowledge as to what was in the actual mind of the XL underwriter when he or she did this, industry custom and practice is instructive in at least two ways.

68.   First, when an underwriter adds specific words to a competitor's definition which he is largely otherwise copying, especially in an endorsement, he is trying to say something, or at minimum, it is the reasonable expectation of an insured that he is saying something.  In this case, it is that Securities Claims include violations of common law, i.e. breaches of fiduciary duty, as respects securities transactions.  In my experience as both an underwriter and an insurance broker for many years, I have difficulty imagining a different rational interpretation.

69.   Second, the *entire point* of the definition of Securities Claim is to eliminate the problem of allocating defense cost and settlements as between individual directors and officers and corporations in any case involving securities where both parties are named.  It is the very reason why AIG created Entity Coverage and created the definition of Securities Claim 35 years ago.  To interpret and apply a definition of Securities Claim, especially one that includes the "whether statutory or common law" phrase, in a case involving securities which names both individual directors and officers and the corporation, such as cases involving allegations of breach of fiduciary duty, in a manner which *creates* allocation issues rather than eliminates them is, from a point of view of industry custom and practice, incorrect.  This is also true in the context of amending the boilerplate definition of Securities Claim in 2016 by endorsement since it is the reasonable expectation of an insurance broker that a carrier would not be restricting that definition by endorsement.

17

70.   As respects Travelers, Traveler's choose to provide excess *follow form* insurance above XL, essentially putting themselves in the shoes of XL and saying to the insured "treat me as if I am XL."

71.   Further, Travelers as an experienced D&O carrier in its own right would also know the two points I make above.

72.   Finally, industry custom and practice is that: (1) if a carrier added words to a competitor's form that it was largely copying, especially in an endorsement, it was doing so for a reason; and (2) a D&O insurer would not restrict its definition of Securities Claim to exclude violations of common law, i.e. breaches of fiduciary duty, as respects securities transactions, given that the whole purpose of a definition of Securities Claim in a D&O policy, especially one that includes the "whether statutory or common law" phrase, is to eliminate, not cause, allocation problems in all of the common cases in which they arise.

73.   Given these reasonable expectations of an insured, if Travelers intended their follow form excess policy to act contrary, they had an obligation under industry custom and practice to advise the insured.

ISSUE 2.   BUMP-UP

74.   It has long been a known fact to D&O underwriters that mergers and acquisitions are ripe transactions for D&O claims.  However, other than a brief period in the 1980s, the D&O industry has been unsuccessful in including in a D&O policy an M&A exclusion.

75.   So, instead, beginning about 25 years ago, in 1995, the market began to focus on a particular coverage issue that appears in some types of M&A claims, one that quickly became known as the "Bump-Up" issue.

76.   The "bump up" issue is whether coverage should be provided by a D&O policy for so-called "bump ups" in the price or consideration paid, or allegedly paid, in a settlement of a claim relating to an M&A transaction.

77.   AIG decided to include the industry's first bump-up exclusion in the 1995 D&O policy mentioned above.  As is the case with almost all bump-up exclusions, it was written as an exception to the definition of loss, and read:

> Further, with respect to coverage B only, Loss shall not include damages,
> judgments or settlements arising out of a Claim alleging that *the Company paid*
> inadequate or unfair price for consideration for the purchase of *its own securities*
> or the securities of a Subsidiary[10].  (emphasis added)

78.    This exclusion might be called the first generation bump-up exclusion and only applied
to claims against acquirers buying their own stock.

79.    Over the course of the years, the bump-up exclusions has been modified by AIG several
times[11].

80.    In 2002, just two years after AIG's 2000 form, Chubb came out with a revised bump-up
exclusion:

> Loss shall not include…(g) any amount that represents or is *substantially*
> equivalent to an increase in the consideration paid (or proposed to be paid) *by an*
> *Organization* in connection with its purchase of *any* securities or assets.
> (emphasis added)

81.    This exclusion was different than AIG's and became the core of the underwriting
industry's philosophy that bump-up exclusions should only apply to claims against the
acquirers in an M&A transaction and should not apply to claims against the directors
and officers of the target.  The theory behind this, articulated by Chubb's Senior Vice
President Tony Galban at a 2012 industry conference[12], essentially was that D&O
claims against an M&A transaction's target directors and officers sounded too much
like any standard D&O claim.  Such claims tend to allege that the target board breached
their fiduciary duty in the process of evaluating the value of the company in the M&A

---

[10] AIG D&O 5/95, Definition of Loss

[11] In 1996, 1998, 2000.  The definition in its most recent form reads:  and exists in its most current form (2010), the
same as the 2000 form, as follows: In the event of a **Claim** alleging that the price or consideration paid or proposed
to be paid for the acquisition or completion of the acquisition of all or substantially all of the ownership interest in or
assets of an entity is inadequate, **Loss** with respect to such **Claim** shall not include any amount of any judgment or
settlement representing the amount by which such price or consideration is effectively increased…

[12] "… when you are talking about a breach of fiduciary duty claims against directors and officers, you are right in
the bread basket of D&O contract. There is no way you can issue D&O contract ugh...with trying to exclude that
stuff" (*What's New in M&A Litigation, ACI, 2012*)

transaction and thus any damages suffered by the company's stockholders are arguably simply the result of such negligence[13].

82.　Not all carriers agreed.  Some believed that the amount of any settlement in an M&A claim representing (or what the carrier reasonably believes represents) the "increase in price or consideration" paid in in the transaction should be excluded even in D&O claims against the target company's directors and officers.  These carriers refused to adopt the standard bump-up language of the market, language like Chubb's, and instead adopted an "absolute" bump-up exclusion.  One such carrier was Starr  in their 2009 form which contained the following bump-up exclusion:

> Loss defined not to include "any amounts that represent, or are substantially equivalent to, an increase in the price or consideration paid, or proposed to be paid, in connection with the purchase of securities or assets."

83.　This version of the bump-exclusion makes no distinction between acquirer and target.

84.　Accordingly, both in 2016 and today, there are essentially three categories of the bump-up exclusions:

A.　 "Limited Version" (AIG 1995 - exclusion applies to acquirers who purchase their own securities, still used by some carriers like Allied World but not AIG);

B.　"Standard Version" (exclusion applies only claims against Acquirers not Targets, e.g. Chubb); and

C.　"Absolute Version" (exclusion applies to claims against both Acquirers and Targets e.g.  Starr 2009).

85.　Suffice to say, however, that as the issue of bump-ups and the emergence of bump-up exclusions are now over 25 years old and well established in the D&O market, time has long past when a carrier would, as a matter of industry custom and practice, argue for the existence of an implied or inherent bump-up exclusion or, more precisely, that a D&O policy's definition of Loss inherently does not include the amount of the bump-up.

---

[13] Other carriers followed Chubb's lead, sometimes usually different language, such as **Old Republic** ("Loss (other than Defense Costs) does not include … (4) any amount that represents or is substantially equivalent to an increase in the consideration paid or proposed to be *paid by a Company* in connection with its purchase of *any* securities or assets") **and Zurich** (""Loss" does not include … (3) any amount incurred by the Company that represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid *by a Company* in connection with its purchase of any securities or assets.")

86.     A bump-up claim against the director or officer of the target sounds exactly like the type of breach of fiduciary duty claim that insured reasonably expects D&O carriers to cover and most D&O underwriters agree.  If a particular D&O underwriter does not wish to cover such a Loss, there is language established in the market for at least the last 15 years available to use to exclude it.  If they fail to make use of such language, the insurers must cover the Loss.  No reasonable broker would believe, and no rational insurer would believe, in 2016, that a D&O policy without a bump-up exclusion magically excluded bump-ups anyway.  There is simply no rational basis for such an argument under industry custom, practice and standards.

_____

Ty Sagalow

**Appendix A**
**Documents Reviewed**

1.  Coverage Pleadings

    a.  Calamos Asset Management, Inc. v. Travelers Casualty and Surety Company of America Complaint (Sup.Ct. Del.)("Complaint")

    b.  Calamos Asset Management, Inc. v. Travelers Casualty and Surety Company of America Answer and Affirmative Defenses (Sup.Ct. Del.)("Answer")

2.  Insurance Policies

    a.  Management Liability and Company Reimbursement Policy No. ELU146965-16 issued to Calamos Asset Management, Inc. by XL Specialty Insurance Company providing $10,000,000 limit of liability for the policy period October 27, 2916 to October 27, 2017 ("Policy" or "XL Policy" or "Primary Policy")

    b.  Excess Insurance Policy No. 232598 issued to Calamos Asset Management, Inc. by Continental Casualty Company ("CNA") providing $10,000,000 limit of liability excess of $10,000,000 limit of liability for the policy period October 27, 2916 to October 27, 2017 ("CNA Excess Policy")

    c.  *SelectOne+* Excess Policy No. 106619457 issued to Calamos Asset Management, Inc. by Travelers Casualty and Surety Company of America providing $10,000,000 limit of liability excess of $20,000,000 limit of liability for the policy period October 27, 2916 to October 27, 2017 ("Travelers Excess Policy")

3.  Correspondence

    a.  March 22, 2017 letter from XL Catlin to Calamos ("XL Denial Letter")
    b.  May 23, 2017 letter from Travelers to Calamos (" 'Receive and Adopt' Travelers Denial Letter")
    c.  August 16, 2017 letter from Calamos (via counsel) to XL
    d.  October 9, 2017 letter from Calamos (via counsel) to XL counsel
    e.  August 3, 2018 letter from Travelers (via counsel) to Calamos ("Supplemental Travelers Denial Letter

**Appendix B**

**CURRICULUM VITAE**

# TY R. SAGALOW

51 JFK Parkway, First Floor West, Short Hills NJ 07078• (917) 620-2174 •

tysagalow@innovationinsurancegroup.com

**SUMMARY**

**CEO & Founder, Innovation Insurance Group, LLC**, a premier consulting firm to the insurance industry specializing in expert witness services focused in management and professional liability, and product development. (www.innovationinsurancegroup.com).  Former senior executive for large global insurance companies with proven track record of management success. Expertise in new product development, management/professional liability products, cyber-risk and reputational risk products.  Customer Focused, Results-oriented, entrepreneurial, visionary, inventive.

**KEY POSITIONS**

- CEO & Founder of insurance consulting firm specializing in new product development and expert witness services.
- Chief Insurance Officer of Lemonade Inc, a Sequoia backed "P2P" Insurance company
- Former Chief Innovation Officer of AIG, Zurich North America and Tower Group.
- Former Chief Underwriting Officer for National Union (world's largest D&O/E&O underwriter)
- Former General Counsel for National Union (world's largest D&O/E&O underwriter)
- Former Chief Operating Officer for AIG eBusiness Risk Solutions (largest US based cyber-risk insurance company)
- Licensed P&C Insurance Broker

**KEY ACHIEVEMENTS**

- Over 84 expert witness engagements as of  November 2019 including major insurance companies, brokers, law firms (representing both carrier and policyholder) and entrepreneurs. (Innovation Insurance Group)
- Founding member of first InsurTech insurance carrier in the United States with a post money valuation of $620 million after only 18 months of operation (Lemonade)
- Exclusive "*Ask the Expert*" senior advisor for Advisen (D&O, E&O and Cyber)
- Host of "*Innovations in Insurance with Ty Sagalow*", "*What's New in Insurance*" - World Risk and Insurance News
- No 1 "New Product Innovator of the Year " for 2011 for first time in company 180 year history (Zurich)
- Produced $1.5B+ GWP from new and enhanced; improved development time by 33% (Zurich)
- Chief designer of cyber-insurance, a $1B industry premium business in 2012 (AIG)
- Chief designer of reputational risk insurance for Zurich and AIG
- Chief designer of Y2k Insurance (AIG)

- Chief designer of Coverage C (Entity Coverage) in Directors and Officers liability insurance (AIG)
- Authored several published works
- Frequent Speaker before industry forums, FOX; testified before Congress and Chaired Congressional committees

**PROFESSIONAL EXPERIENCE**

**Innovation Insurance Group, LLC** *CEO & Founder* **(3/12 to Present) (4/11/-8/11)**
Founded first known consulting company designed to provide broad array of product development services to the insurance industry. In 2013, firm created a second major practice group providing expert witness services specialized in management and professional liability.  For more information, www.innovationinsurancegroup.com; a list of clients and partners in expert witness field, go to http://innovationinsurancegroup.com/our-services/expert-witness-services/

**Lemonade Insurance Company,** *Board Member* **(8/15- Present)**
**Lemonade Insurance Company,** *Chief Executive Officer* **(8/15- 7/17)**
**Lemonade, Inc,** *Chief Insurance Officer* **(8/15 – 7/17)**
Responsible for insurance operations at first "Peer-to-Peer" insurance licensed carrier.

**Tower Group,** *Chief Innovation Officer (8/11 - 3/12)*
Responsible for shepherding #40 P&C company to its next evolution of organic growth thru the development of new products.

**Zurich North America,** *Chief Innovation Officer (1/09 - 4/11)*
Responsible for department charged with creating or enhancing products and launching them into marketplace for U.S.
- $1.5B in premium generated from products created new or enhanced from January 2009 (over $250M in new business)
- Launched 66 products in 2010 presenting 22.7% of all current products generating 17% of all GWP in Dec 2010
- Launched 12 "national Sales campaigns" in various industry verticals with minimum annual GWP of $50M each.

**AIG,** *President, Product Development - Worldwide* (2004-2009)
Responsible for department charged with creating new products for all member companies of AIG in General Insurance
- Launched new insurance product every 15 days. Both foreign and US product launches.
- Called "a unit without peer in the insurance industry"

**AIG,** *Chief Operating Officer, AIG e-Business Risk Solutions* (2000-2003)
   Found and created cyber-risk insurance, a new market niche producing $20M (Y1) climbing to $100M (Y4)

**AIG,** *Chief Underwriting Officer and General Counsel, National Union* (1988-1994) (1994-1999)
Responsible for all major underwriting decisions for largest management liability insurance carrier producing approximately $4 billion in sales annually. Responsible for managing in-house attorneys.

**AIG,** *Staff Counsel* (1983-1988) Responsible for cases under portfolio as staff litigation counsel.

## PUBLIC POLICY EXPERIENCE

*Public Policy Advocacy* (2000 -Present) Experienced in public policy, lobbying and legislative process in cyber-risk security.

## EDUCATION

**New York University Law School**, New York, NY (L.L.M, 1987)
**Georgetown University Law Center**, Washington, DC (J.D. *cum laude,* 1983)
**Long Island University**, Brookville, NY (B.A. *summa cum laude,* 1980)

## BAR and LICENSES

New York Bar (1983)
U.S. Supreme Court Bar (2003)
P&C Insurance Broker (multiple states)

## BOARDS AND CHAIRS

Chairman, Internet Security Alliance (2007-2011); Board Member, Financial Services Information, Sharing and Analysis Center (FS/ISAC) (2004-2009); Chaired various congressional committee and private sector task forces

## SELECTIVE MAJOR PUBLICATIONS

Directors and Officers Liability and Insurance Handbook, National Association of Corporate Directors, 1999; Director and Officer Liability: Indemnification and Insurance (with Josiah Hatch and John Olson), Clark Boardman Callaghan, 1990, 1994; @ Risk, The definitive guide to legal issues of insurance and reinsurance of internet, e-commerce, cyber

## APPEARANCES

Have appeared on FOX, CNBC, Bloomberg Radio, World Business Review and National Press Club. Have appeared at the White House, Departments of Treasury, Defense, Homeland Security, and Congress in addition to regular industry forums.

## ADDITIONAL INFORMATION

http://innovationinsurancegroup.com/about/ty-r-sagalow-ceo/
www.linkedin.com/in/tysagalow

## All List of Publications (2006-2019)

1. Accounting Irregularities and Financial Fraud (with Michael Young) (*Harcourt Brace & Co, 2000-2006)*

2. *The Role of Cyber Insurance in Fighting the War on Terror,* Cutter IT Journal, May 2006.

3. Tot Ten Steps When Faced with a D&O Denial Letter (Financier Worldwide, August 2014)

## Testimony at Deposition or Trial (2013-2019)

1. First Horizion v Certain Underwriters at Lloyds, et al (Deposition) (District Court, Tennessee, 2013)

2. JP Morgan Chase v Indian Harbor (Deposition) (Supreme Court, State of New York, 2014)

3. FDIC v Rafael Arrillaga-Torrens, Jr. et al [Eurobank] (Deposition) (District Court, Puerto Rico, 2014)

4. Millennium v Darwin Insurance Company (Deposition)  (District Court, San Diego) (2014)

5. Sandburg vs National Union  (fact witness) (Deposition) (District Court, Texas) (2014)

6. Millennium vs. Allied World Insurance Company (Deposition) (District Court, San Diego) (2014)

7. Millennium v Darwin Insurance Company (Trial)  (District Court, San Diego) (2015)

8. Repid vs. Philadelphia Insurance et al (Deposition) (Circuit Court, Maryland) (2015)

9. Imperium vs. Shelton & Associates (Deposition)(District Court, Mississippi) (2015)

10. Beazley vs. ACE (Deposition)(District Court, New York) (2015)

11. Illinois National Insurance vs. AlixPartners (Deposition) (Circuit Court, Michigan) (2016)

12. Baldwin vs. Aon Risk Services (Deposition) (Superior Court, Frenso (CA) (2016)

13. Patriarch Partners vs. Axis Insurance Company (Deposition) (District Court, NY) (2016)

14. Fidelity and Deposit Company of Maryland (Zurich) vs First National Community Bankcorp (Deposition) (District Court, PA) (2016)

15. Crowley Maritime Corporation vs National Union Fire Insurance Company of Pittsburgh, P.A. (Deposition) (District Court, FL) (2017)

16. Universal Cable Productions et al vs Atlantic Specialty Insurance Company (Deposition) (District Court, CA)(2017)

17. Intestate Fire & Casualty Company vs AXIS Surplus Insurance Company (Deposition) (Circuit Court, FL) (2017)

18.   ONYX Pharmaceuticals, Inc. vs Old Republic Insurance Co., et al (Deposition) (Superior Court, CA)(2018)

19.   Rosela et al vs. American Power Boat Association...Specialty Insurance Group, Inc., Everest National Insurance et al (Deposition) (District Court, MD) (2018)

20.   Landmark Worldwide, LLC vs. Seyfarth Shaw LLP (Deposition) (Superior Court, CA) (2018)

21.   Landmark Worldwide, LLC vs. Seyfarth Shaw LLP (Trial) (Superior Court, CA) (2018)

22.   ONYX Pharmaceuticals, Inc. vs Old Republic Insurance Co., et al (Trial) (Superior Court, CA) (2018)

23.   Peavy Electronics v. NUFIC and McGriff, Seibels & Williams (deposition) (Circuit Court, Birmingham Alabama)(2018)

24.   Intestate Fire & Casualty Company vs AXIS Surplus Insurance Company (Trial) (Circuit Court, FL) (2018)

25.   Pretl v. AAAfordable Transportation v. Baltimore City Board of School Commissioners (deposition) (Circuit Ct, MD)(2018)

26.   Scottsdale Insurance Company vs CSC Agility Platform, Inc Fka ServiceMesh (deposition) (District Court, CA)(2019)

27.   Scottsdale Insurance Company vs CSC Agility Platform, Inc Fka ServiceMesh (deposition) (District Court, CA)(2019)

28.   Zurich v D&T Holding (deposition)(Arbitration, IL)(2019)

29.   Senescu v. Keating (deposition)(Arbitration, CA)(2019)

30.   Senescu v. Keating (Arbitration)(Arbitration, CA)(2019)

31.   McGrath v. National Union (deposition) (District Court, Fla.)(2019)

32.   Construction Financial Administration Services vs Federal Insurance Company (District Court, PA)(2019)

## List of All Publications

1.   Directors and Officers Liability, Indemnification and Insurance (with Josiah O. Hatch, III and John F. Olson) (*West Group/Clark Boardman Callaghan*) (1994)

2.   Directors and Officers Liability Insurance: A Director's Guide (*National Association of Corporate Directors, 1999)*

3.   *Board Responsibilities for Managing the Risk of eBusiness*, Director's Alert, 2001

4.   *@ Risk, The definitive guide to legal issues of insurance and reinsurance of internet, e-commerce and cyber perils*, Reactions Publication, 2002

5.   *Cyber-Risk Management: Technical and Insurance Controls for Enterprise-Level Security* (with Carol A. Siegel and Paul Serritella), Information Security Handbook, 5th Edition, Harold F. Tipton, Auerbach Publications, 2003

6.   Accounting Irregularities and Financial Fraud (with Michael Young) (*Harcourt Brace & Co, 2000-2006)*

7.   *The Role of Cyber Insurance in Fighting the War on Terror,* Cutter IT Journal, May 2006.

8.   Tot Ten Steps When Faced with a D&O Denial Letter (Financier Worldwide, August 2014)